Opinion issued April 20, 2017



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-15-00393-CR

———————————

**CHRISTOPHER ERNEST BRAUGHTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Case No. 1389139**

### OPINION ON REHEARING

We issued our original opinion in this case on December 29, 2016. Appellant, Christopher Braughton, filed a motion for rehearing. We overrule the motion for rehearing, withdraw our previous opinion, and issue this substitute opinion. The disposition remains the same.

Chris Braughton, age 21, shot Emmanuel Dominguez, age 27, on the street outside Chris's parents' home at approximately 10:00 p.m. The shooting followed an episode of road rage between Dominguez and Chris's father, Christopher Braughton Sr., age 40, while Braughton Sr. was driving home with his wife and other son, age 13. According to the statement of Chris's mother, Dominguez "cut us off and then pulled up beside us and followed us home." Although many of the events after that point are disputed, it is undisputed that Dominguez and Braughton Sr. engaged in a physical altercation in which Dominguez punched Braughton Sr., that Chris ran out of the house brandishing a gun in an attempt to protect his father, and that the fight stopped at least momentarily when Dominguez knocked Braughton Sr. to the ground and Chris first spoke. The evidence is mixed on whether Dominguez said he had a gun, but the evidence is undisputed that no gun was found on Dominguez or within his reach and that Chris aimed his gun at Dominguez and shot him once, killing him.

A jury found Chris guilty of murder and assessed his punishment at 20 years' confinement.[1] In three issues, Chris argues that (1) the evidence is legally insufficient to establish that he had the required mental state to commit murder; (2) the evidence is legally insufficient to reject his claims of self-defense and defense of others; and (3) the trial court committed reversible error by denying his

---

[1]     *See* TEX. PENAL CODE § 19.02(b)(1)–(2).

request to provide an instruction in the jury charge on the lesser-included offense of deadly conduct.

We affirm.

**Background**

**A.    The Braughton family encounters Dominguez**

Emmanuel Dominguez, the complainant, was a United States Marine, preparing to leave the Marine Corps and using up his vacation time until his discharge. In early May 2013, Dominguez moved to Spring, Texas and rented a house with his girlfriend, Jessica Cavender, who was also a United States Marine and had recently been assigned as a recruiter in Conroe, Texas. Their house was on Greenland Oak Court.

On May 24, 2013, Dominguez and Cavender went to a restaurant, where they ate, drank beer, and socialized. While there, they met another Marine who invited them to an icehouse, where they continued drinking. Sometime later, yet another veteran invited them to a karaoke bar, where they continued socializing and drinking. While at the karaoke bar, Dominguez and Cavender got into a verbal disagreement, and Cavender refused to accompany him to their home. Dominguez, who was intoxicated, left alone on his motorcycle.[2]

---

[2]    At the time of his death, Dominguez had a blood alcohol concentration of 0.17 grams per deciliter, which is more than twice the statutory limit of 0.08 grams per

3

That same evening, Chris's father ("Braughton Sr."), mother ("Mrs. Braughton"), and younger brother were dining out while Chris, age 21, stayed home at his parents' house. The Braughtons, like Dominguez, lived on Greenland Oak Court, but Chris had never met Dominguez. After dinner, at approximately 10:00 p.m., Braughton Sr. began driving home, with Mrs. Braughton and their younger son riding in the family vehicle.

Braughton Sr. testified that, as they were nearing their home, he was driving approximately 15 to 18 miles per hour in an area with a 20-mile-per-hour speed limit when he saw a "big bright light" immediately behind his vehicle. He testified that he then heard "a really loud revving sound," and then a vehicle alarm alerted that there was an object very close to the vehicle's rear bumper. He determined from the light, the engine sound, and the vehicle's alarm that a motorcycle was very close behind his car.

According to Braughton Sr., Dominguez, who was driving the motorcycle, came around the side of the car, "tried to swerve into the side of the car," then came around the front of the car and "slam[med] on his brakes." The vehicle's proximity sensors again sounded. Braughton Sr. "slam[med]" on his own brakes to avoid hitting the motorcycle, then sped around the motorcycle and continued

---

deciliter for driving while intoxicated. *See* TEX. PENAL CODE §§ 49.01(2)(B), 49.04(a).

heading home. Dominguez followed the Braughton family onto Greenland Oak Court, where, unknown to either driver, they both lived.

As the Braughtons approached their house in their vehicle, Mrs. Braughton called Chris and told him they were being chased. Braughton Sr. testified that his wife said, "Son, there's a guy chasing us. I'm scared," while Mrs. Braughton recalled saying, "Son, this guy is chasing us. We are right by the house." The call lasted less than seven seconds, and Mrs. Braughton did not tell Chris to come outside, arm himself, or indeed to do anything at all. Braughton Sr. and Mrs. Braughton testified that they believed that Dominguez was attempting to rob or carjack them. No one, however, called either 9-1-1 or a non-emergency police line at that time.

According to Braughton Sr., the motorcycle "start[ed] coming around the car" again and blocked the Braughtons' driveway. Braughton Sr. drove around the cul-de-sac at the end of Greenland Oak Court, stopping on the opposite side of the street from his home. Dominguez stopped his motorcycle near the driveway to the home of Robert Bannon, who lived in the home between the Braughton residence and the house rented by Dominguez. Bannon, who was sitting in his driveway at the time, noticed that the motorcycle was only one or two feet away from the Braughtons' car and "thought [Dominguez] didn't know how to drive a motorcycle because he looked like he was kind of wobbling." Dominguez dismounted or fell

5

off the motorcycle without engaging the kickstand, and then he either threw down the motorcycle or let it fall to its side in the street.

## B. Braughton Sr. and Dominguez confront each other

According to Glen Irving, a neighbor who witnessed the events, Dominguez "rather quickly" approached the Braughtons' car, and Braughton Sr. got out of his vehicle. But according to Bannon, Braughton Sr. "quickly" got out of the car and "immediately yelled" at Dominguez, demanding to know, "Why the f___ you following me so close for?" Both Bannon and Irving testified that the two men yelled and swore at each other. Irving also testified that Dominguez began punching Braughton Sr. in his face and "beating him up," while Braughton Sr. attempted to defend himself.

Braughton Sr. testified that, while these events were unfolding, he was yelling to his wife, "Get inside," and, "Call 9-1-1," at which point Dominguez began punching him. Braughton Sr. testified that Dominguez hit him two or three times. Dominguez then knocked Braughton Sr. to the ground. This altercation occurred closer to the motorcycle than to the Braughtons' car.[3]

Meanwhile, Chris, who was inside the Braughtons' home, had run to the front door and heard a "loud motorcycle noise." He went to his parents' bedroom,

---

[3] Two independent witnesses, Bannon and "Gina" (a pseudonym, as stated in note 4, *infra*), did not see any physical fight between Braughton Sr. and Dominguez. A photograph taken by police showed Braughton Sr. with a bloody lip.

where he kept a 9-millimeter handgun that he had purchased approximately three months earlier. He retrieved the gun and the magazine, which was kept separately, inserted the magazine into the gun, and pulled back the slide to chamber a bullet. At this point, according to Chris, the safety mechanism on the gun was disengaged and the gun was ready to fire.

During the altercation between Dominguez and Braughton Sr., Chris came out of his parents' house with the loaded gun, saw Dominguez hitting Braughton Sr., and said two or three times, "I have a gun," or, "Stop, I have a gun." Chris testified that, when he left the house, he had not seen or heard that anyone outside had a weapon of any kind and did not know who had started the fight. There is no evidence in the record that Chris knew that a physical fight was underway before he left the house with a gun. And Chris conceded at trial that the fight was closer to the motorcycle than to the car, indicating that his father had moved farther than had Dominguez. Braughton Sr. did not see Chris exit the house; rather, he first saw him when Chris was three feet away from Dominguez, pointing the gun at Dominguez. According to Mrs. Braughton's sworn statement, she said around this time, "Chris, go, you know, take the gun inside. Take the gun inside."

## C.     Dominguez reacts to the gun

Witnesses at trial gave conflicting accounts of what happened next. Chris, Braughton Sr., Mrs. Braughton, and Irving all testified that Dominguez then

7

verbally responded to Chris and either moved toward or reached into the saddlebags on the motorcycle. The details of their testimony, however—whether Dominguez indicated that he had a gun and whether he actually reached his motorcycle, which was some unspecified distance away from the fight—conflicted. Specifically, Chris testified that Dominguez said, "Oh, you have a gun, m_____f_____. I have a gun for you," then reached into a saddlebag on the motorcycle. He later testified, however, that Dominguez used the word "something," not "a gun."

According to Braughton Sr., Dominguez "reache[d] down and he [said], 'You got a gun, m_____f_____, I have something for your f_____ a__.'" Elsewhere in his testimony, however, Braughton Sr. recalled that Dominguez said "gun," not "something." Braughton Sr. specifically testified that Dominguez "reache[d] in[to]" the saddlebag before he was shot.

Mrs. Braughton testified that Dominguez "reache[d] towards his bike, the boxes on his bike," and quoted him as saying, "You have a gun, m_____f_____. I have something for your a__." Elsewhere in her testimony, she reported the second sentence as, "I have a gun for your a__." She also testified that she saw Dominguez reaching toward his motorcycle while she was running into her home.

Neighbor Irving testified that Dominguez "turned and started back towards the motorcycle, and [Irving] heard a voice say, 'Yeah, I got a gun, too . . . .'" When

8

pressed to "recall exactly what [he] heard," Irving said that he heard either "I got a gun, too," or possibly, "I've got something for you . . . ." He testified that he could not "say 100 percent positively" which statement he heard. Although Irving testified that Dominguez moved toward the motorcycle, he did not see Dominguez reach into the saddlebags. He testified that, if Dominguez had done so, he "should have been able to see it" from his vantage point, but he could not "say positively that [he] would have seen it."

Chris testified that Dominguez was positioned with the saddlebag to his left, reached across his body with his right arm, turning as he did so, and began to straighten up. Similarly, Braughton Sr. testified that Dominguez reached toward a saddlebag on the motorcycle, "just grab[bed] the box and open[ed] it," then reached into it.

Gina,[4] a high-school junior who also lived on Greenland Oak Court, testified with a different account. Gina watched events unfold from her second-story bedroom window in a house across the street. Gina testified that she could not see many details of the scene "clearly" because a light-blocking screen on her window made her view of the street "blurry." She could not see faces clearly and did not see a gun, but testified that she heard Mrs. Braughton tell Chris, "Put the gun down." Gina further testified that, instead of complying, Chris replied, "No, I got a

---

[4]    Because the witness was a minor at the time of the shooting, we use a pseudonym.

gun now," and walked toward Dominguez, who "stopped and put his hands up" and "slowly back[ed] up." Gina physically demonstrated the shooting at trial on direct examination, but the record does not reflect any testimony regarding the orientation of Dominguez's body with respect to either Chris or Chris's gun.[5] Gina did not see Dominguez approach the motorcycle, open a saddlebag, or reach for anything.

### D.    Chris kills Dominguez

The remaining sequence of events is undisputed. Chris testified that he "pointed [the gun] towards [Dominguez's] arm" without "aiming at a specific area on him" and pulled the trigger. He shot Dominguez one time. The bullet hit Dominguez under his right armpit, toward the back of his body. It traveled right to left, "very slightly upward," and "slightly back to front," puncturing both of Dominguez's lungs and damaging his "aorta, the major artery coming out from the heart," resulting in the loss of at least three liters of blood. The medical examiner who later examined Dominguez, Dr. Morna Gonsoulin, testified that such injuries can kill a person "within seconds."

---

[5]    Chris argues that Gina's testimony "can only be read to say that Dominguez was facing [Chris] when the shot was fired," but she did not expressly give such testimony. The State acknowledges that Dominguez must have turned before he was shot. No witness expressly stated that Dominguez was facing Chris when or just before he was shot.

10

Dominguez fell to the ground. According to Gina, Mrs. Braughton then said to Chris, "What did you do?"

Mrs. Braughton dialed 9-1-1 on her cell phone and handed the phone over to Braughton Sr., who talked to dispatch. Braughton Sr. explained several times during the call that a man had chased his family and attacked him and that his son—that is, Chris—shot the attacker. He did not mention any verbal threats by Dominguez, nor did he say that anyone feared a carjacking or robbery at any time. Although Mrs. Braughton and Bannon attempted to perform CPR, Dominguez died on the scene. Chris placed the gun in the house, waited for the police, and identified himself as the shooter to police when they arrived at the scene.

The investigating officers took statements from a number of witnesses, including Gina. The officers made an audio recording of their interview with Gina. Sergeant A. Alanis of the Harris County Sheriff's Office testified that he attempted to take statements from Braughton Sr. and Mrs. Braughton, but both declined to give statements. Braughton Sr. testified that he attempted to write a statement, but an officer took away the clipboard that he was writing on. Mrs. Braughton gave a written statement in which she wrote that Dominguez "trie[d] to pull something out of his box on his bike" but did not mention any threats by Dominguez. At the time of the shooting, officers did not identify Irving as a witness.

11

**E.     Evidence at trial**

The State charged Chris with murder. At trial, Gina testified that she did not have a relationship with or know the names of any of the individuals involved, although she recognized them as her neighbors and was able to associate them with their respective homes. She identified the participants by the color of the clothing that they wore on the night in question and their respective genders. Using those descriptions, she testified that she saw Braughton Sr. and Dominguez arguing when Chris came from the direction of the Braughtons' house "with his right arm stretched out with a gun in his hand." She testified that Chris "just walk[ed] straight to [Dominguez] and then he stop[ped]." Gina stated that Dominguez was backing up with his arms raised when Chris shot him.

Gina confirmed that her memory of events "would be better whenever I made the statement" to police on the night of the shooting than at trial and that everything she had said in her statement was true and correct. Her statement was admitted into evidence and played for the jury. In it, as at trial, she described the participants in the confrontation by clothing and gender, though she stated that the person in black—that is, Chris—argued and engaged in a shoving match with the person in red—that is, Dominguez. She stated that the person in black had a gun and shot the person in red one time. At trial, she testified that she had misspoken

and that the person in orange—that is, Braughton Sr.—was the person who had argued with Dominguez.

The State also presented testimony by Bannon, who testified that he did not "see anyone throw a punch or kick at each other," though he was "maybe 20 feet away" from the confrontation and had "a good view" of both men. Rather, he testified that Braughton Sr. and Dominguez were "[j]ust yelling." Bannon heard Chris say, "I have a gun," then heard a woman, possibly Mrs. Braughton, say, "'We're recording you,' or 'We're recording this.'" He testified that he "thought there was a fight about to break out" at the moment when Chris came out of the house. When Bannon saw that Chris had a gun, he went into his home to retrieve a rifle to "try to [defuse] the situation [and] have [Chris] put his gun down." He testified that he neither saw nor heard the shot being fired. By the time Bannon returned to his front door, Dominguez was lying on the ground, so Bannon went outside without the rifle.

The State called three investigating law enforcement officers: Corporal J. Talbert of the Constable's Office, Precinct 4; Sergeant Alanis; and Harris County Sheriff's Deputy D. Medina. All three had responded to the scene of the shooting. Corporal Talbert authenticated several photographs as fair and accurate representations of the scene as it appeared when he arrived. Several of these photographs show one of the two saddlebags on Dominguez's motorcycle open.

13

Deputy Medina testified that she found no gun or other weapons on Dominguez's person or in his saddlebags but that one of the saddlebags was open when she arrived on the scene.

Corporal Talbert specifically noted "a cell phone . . . towards the middle of the cul-de-sac." He testified, "Somebody tried to pick up the cell phone that was in the cul-de-sac" but he "told them to leave it where it was." Sergeant Alanis also testified that law enforcement collected a cell phone in the cul-de-sac and that he "was advised it was the defendant's father's." He also testified, "The father requested the phone back, and I told him it was going to be evidence until it was downloaded." By the time Alanis attempted to search the phone, it "had been wiped" and "appeared like when you buy a brand new phone." Alanis was not able to recover any information from the phone.

Dr. Gonsoulin, the assistant medical examiner who conducted Dominguez's autopsy, testified that Dominguez died from a single gunshot wound and that the path of the bullet went "basically from the right armpit to the left armpit." For the bullet to follow its trajectory, Dominguez had to have exposed his right armpit and had his left side slightly lower than the right when he was shot. According to Dr. Gonsoulin, this meant that Dominguez could have been shot while bending, reaching, or extending his right arm across his body toward his left side. She testified that the gun could not have been "straight ahead pointing" at Dominguez's

14

chest. Dominguez could have been shot while turning, but it was "impossible" for him to be "shot facing the shooter with his arms up." She also testified, however, that in general reaching down and across the body would not sufficiently expose the armpit, explaining, "There might be an angle where you could just be reaching down and [the wound area] would be exposed, but you would have to at least extend your shoulders slightly to get the differential in the arms." Dr. Gonsoulin's testimony was supported by photographic evidence showing that the gunshot wound was under Dominguez's right arm, an X-ray image showing the bullet inside the left side of Dominguez's chest, and the autopsy report describing the bullet's trajectory.

The State presented further testimony. Harris County Sheriff's Deputy F. Williams testified that he unsuccessfully attempted to recover video from the Braughtons' home security system. S. Williams, a forensic chemist, testified that Chris had gunshot residue on both of his hands when samples were taken shortly after the shooting. A firearms examiner testified regarding the operation of Chris's gun. A DNA analyst, Z. Phillips, testified that she found DNA consistent with Braughton Sr.'s DNA on a knuckle on Dominguez's right hand but did not find any DNA consistent with Chris's DNA on Dominguez.

The State presented testimony from Cavender regarding her relationship with Dominguez, their move to Spring, and the time they spent together the day

Dominguez died. Cavender testified that Dominguez did not have any weapons on his person or on his motorcycle on the day he died. Her phone and keys were in the motorcycle's saddlebags at the time of the shooting.

The defense presented testimony from Glen Irving, Braughton Sr., and Mrs. Braughton that Dominguez was chasing the Braughtons erratically down the street and riding "almost on [their] bumper." The Braughtons all testified that Mrs. Braughton frantically called Chris while Dominguez was chasing them. Irving and the Braughtons testified that Dominguez and Braughton Sr. fought. According to Irving, Dominguez was "punching and beating up" Braughton Sr. The Braughtons each testified that at that time they were afraid for their lives. Irving and the Braughtons testified that Chris warned Dominguez as the latter was hitting Braughton Sr., "Stop, I have a gun." They all testified that Dominguez knocked down Braughton Sr. and went toward his motorcycle, cursing and threatening that he had "a gun" or "something for" Chris. Each of these witnesses also testified, however, that they never saw a gun or other weapon in Dominguez's possession.

Braughton Sr. testified that he lost his phone on the evening in question. Specifically, he testified that it fell out of his back pocket when Dominguez punched him. He testified that the police took the phone and that the Braughtons "kept asking" where the phone was but that they never regained possession of it. Mrs. Braughton tracked the phone belonging to her youngest son, which was also

16

missing, using an app on her own phone and found that it was "on the next street and was driving away." An officer returned with that phone but said he did not have Braughton Sr.'s phone. According to Braughton Sr., when the Braughtons tracked his phone, they found that it was in Pasadena, assumed it was stolen, and remotely reset it to its factory state.

The defense also presented Gary Gross, who installed the solar screen in Gina's bedroom window. He testified that the screen was a "90 percent Suntex solar screen," meaning that it would "block 90 percent of visible light," was designed to provide privacy, and would be difficult to see through at night. According to Gross, at 10:00 p.m., it would be possible to see "some visible light" through the screen and to "see something," but not to "make out what it is." He confirmed that it would "probably not" be possible for anyone looking through the screen at that time to "make out what they are seeing."

Chris testified that he "was just pointing [the gun] at [Dominguez's] arm" and "just wanted to stop him." According to Chris, he had the gun in the air initially, but he brought it down to his hip to fire. He testified that is not the same way that he would "fire at a gun range." He testified that he was "[n]ot behind [Dominguez but] on the side of him" when he fired the shot. He conceded that he pointed the gun at Dominguez, pulled the trigger, and thought "that a bullet was going to hit" Dominguez. He also testified as follows:

17

Q. You're aware that a bullet hitting somebody can cause serious bodily injury, correct?

A. Sometimes, yes, sir.

Q. So you were aware that—you were aware that you were intending to cause serious bodily injury to Manny Dominguez?

A. Yes, sir.

He also explained that he had "receive[d] some basic information about the operation of the gun" from the salesperson and had fired it at a shooting range on two occasions.

The trial court charged the jury, instructing it on the offense of murder and the lesser-included offense of manslaughter. Additionally, the trial court instructed the jury on the law of self-defense, defense of a third person, and defense of property. Chris requested that the trial court also include an instruction on the lesser offenses of misdemeanor and felony deadly conduct, but the trial court refused.

The jury convicted Chris of murder and assessed his punishment at 20 years' confinement. This appeal followed.

**Sufficiency of the Evidence**

In his first two issues, Chris argues that the evidence was legally insufficient to support his conviction. In the first issue, he argues that no evidence, whether direct or circumstantial, establishes that he possessed the required mental state to

18

commit murder. In the second issue, he argues that the evidence was insufficient to prove beyond a reasonable doubt that he did not act in self-defense or in defense of others.

## A.    Standard of review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence); *Nelson v. State*, 405 S.W.3d 113, 122 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). The jury is the exclusive judge of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) ("Even when a witness's testimony is uncontradicted, the jury can choose to disbelieve a witness.").

We afford almost complete deference to the jury's credibility determinations. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). Rather, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *Clayton*, 235 S.W.3d at 778. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.

20

Crim. App. 2007). "Evidence is legally insufficient when the 'only proper verdict' is acquittal." *Nelson v. State*, 405 S.W.3d 113, 122 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (quoting *Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2218 (1982)).

The jury's ultimate conclusion must be rational in light of all the evidence. *See, e.g.*, *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Matlock v. State*, 392 S.W.3d 662, 673 n.45 (Tex. Crim. App. 2013); *Adames*, 353 S.W.3d at 860; *Nelson*, 405 S.W.3d at 122–23. In reviewing the sufficiency of the evidence when a jury has rejected claims of self-defense or defense of others, we must "determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).[6] When some evidence, if believed, supports a self-defense claim, but other evidence, if believed, supports a conviction, we, as an appellate court, "will not weigh in on this fact-specific determination, as that is a function

---

[6] We agree with the dissent's summary of this standard as requiring us to determine whether it was "rational *both* for the jury to have found appellant guilty of murder, looking at the evidence in the light most favorable to the verdict, *and* for it to have rejected the defenses of self-defense and defense of a third person." Accordingly, we consider whether the jury could rationally have made both such findings, taking all the evidence in the light most favorable to the prosecution.

reserved for a properly instructed jury." *Reeves v. State*, 420 S.W.3d 812, 820 (Tex. Crim. App. 2013).

**B.    Mens rea**

In his first issue, Chris argues that the evidence was insufficient to support a finding that he possessed the required mental state to have committed the offense of murder.

**1.    Applicable law**

A person has the requisite mens rea for the offense of murder when he "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1)–(2). A person acts "intentionally" with respect to the nature or result of his conduct "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). A person acts "knowingly" "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). When, as in this case, the charge presents two legal theories of murder— knowingly causing death or intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes death—the theories are alternative manners and means of committing the offense of murder, rather

22

than distinct offenses. *See Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1982) (en banc) (op. on rehearing).

A conviction may be based upon circumstantial evidence, which is just "as probative as direct evidence in establishing the guilt of an actor." *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Hooper*, 214 S.W.3d at 13). As explained by the Court of Criminal Appeals, "a jury may infer intent from any facts which tend to prove its existence . . . [and a] jury may also infer knowledge from such evidence." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)). This evidence may include acts, words, and conduct of the accused. *Id.*; *see Robbins v. State*, 145 S.W.3d 306, 309 (Tex. App.—El Paso 2004, pet. ref'd) ("[T]he jury may infer the intent to kill from the defendant's words or conduct.").

Further, a "jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon." *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *see Pitonyak v. State*, 253 S.W.3d 834, 844 (Tex. App.—Austin 2008, pet. ref'd) ("When, as in this case, the evidence shows that a deadly weapon was used in a deadly manner, 'the inference is almost conclusive that [the defendant] intended to kill.'" (quoting *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986))). A firearm is a deadly weapon *per se*. TEX. PENAL CODE

§ 1.07(a)(17)(A). In consideration of the evidence, "[i]ntent may also be inferred from the means used and the wounds inflicted, and is a factual matter to be determined by the jury from all the facts and circumstances." *Ervin v. State*, 333 S.W.3d 187, 200 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

### 2. Whether there is sufficient evidence that Chris possessed the required mental state

The State and Chris agree—and Chris testified—that he came out of the house with a gun and ultimately shot Dominguez with a firearm, killing him. Chris does not challenge the evidentiary support of these undisputed facts. Rather, Chris points to the following evidence to argue there was no mens rea evidence: (1) Chris feared for his father's safety upon seeing the fight; (2) he pointed the gun in the air and told Dominguez to stop because he had a gun; (3) Dominguez threatened to pull a gun on him; (4) the forensic examiner testified that Chris shot Dominguez at an angle, not facing face-to-face; (5) Chris testified that the only reason that he discharged the gun was "to stop" Dominguez; and (6) Chris did not flee the scene but instead waited for the police, voluntarily identified himself as the shooter and directed the police to the gun he used.

But this evidence is not relevant to the mental state of intent to kill or cause serious bodily injury; rather, it supports his defenses of self-defense and defense of another person. The evidence shows that Chris came out of the house with a loaded weapon and inserted himself into a dispute between Braughton Sr. and Dominguez

24

in which no deadly force had been used or threatened and which had not caused any serious injury to his father. And he ultimately fired that gun with the intention of striking Dominguez. The "jury [could] infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon." *Jones*, 944 S.W.2d at 647; *see Pitonyak*, 253 S.W.3d at 844.

Chris also argues that evidence about his cooperation with police after the shooting coupled with a lack of prior animosity between the two demonstrates insufficient circumstantial evidence of the requisite mental state for murder under Penal Code sections 19.02(b)(1) and 19.02(b)(2). But Chris used a firearm, a deadly weapon *per se*, to kill Dominguez. TEX. PENAL CODE § 1.07(a)(17)(A). Intent is determined by the jury from all the facts and circumstances in evidence. *Ervin*, 333 S.W.3d at 200. Thus, purposeful use of a deadly weapon could reasonably lead a jury to conclude that Chris possessed the required mental state. *See id*; *Jones*, 944 S.W.2d at 647; *Pitonyak*, 253 S.W.3d at 844.

To support his contention that the jury reached an irrational conclusion here, Chris points to the "robbery-at-a-convenience-store" illustration in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) (plurality op.). The court explained the hypothetical as follows:

> The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B

25

> committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on *all* the evidence the jury's finding of guilt is not a rational finding.

323 S.W.3d at 906–07 (quoting *Johnson v. State*, 23 S.W.3d 1, 15 (Tex. Crim. App. 2000) (McCormick, P.J., dissenting)). The *Brooks* court identified this example as "a proper application of the *Jackson v. Virginia* legal-sufficiency standard." *Id.*

This case is not analogous. There is no evidence that "clearly" contradicts the jury's conclusion that Chris killed Dominguez with the requisite intent. Nor does a review of all the evidence in the light most favorable to the verdict demonstrate that the jury's finding was irrational. Even were we to agree with Chris that the medical examiner's findings regarding the trajectory of the gunshot—the bullet traveling from one armpit to the other—were incontrovertible and that Gina's testimony regarding Dominguez's orientation could be completely disregarded because it conflicted with those findings, the jury rationally could have concluded that Chris acted with the required culpable mental state for murder. And Chris himself acknowledges that there is some evidence indicating a culpable mental state, such as his use of a firearm at close range and his own acknowledgments that he was "intending to cause serious bodily injury to" Dominguez.

Viewing the evidence in the light most favorable to the jury's finding, we conclude that a rational jury could have found that Chris intentionally or knowingly caused Dominguez's death. *See Jackson*, 443 U.S. at 319; *see also* TEX. PENAL CODE §§ 6.03(a)–(b) (definitions of "intentionally" and "knowingly"), 19.02 (elements of murder). The evidence is thus legally sufficient to support the jury's finding that Chris acted with the required mental state to commit murder. We overrule Chris's first issue.

## C. Defenses of self-defense and defense of others

In his second issue, Chris argues that "the State failed to carry its burden of persuasion on his claims that he acted in self-defense and in defense of others."

### 1. Applicable law

Both self-defense and defense of a third party are statutorily defined and provide a defense to prosecution when the conduct in question is "justified." TEX. PENAL CODE § 9.02. Under Chapter 9, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force . . . ." *Id.* § 9.31(a). Similarly, "[a] person is justified in using *deadly* force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a) (emphasis

27

added); *see Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

A person is justified in using deadly force in defense of others "[s]o long as the accused reasonably believes that the third person would be justified in using [deadly force] to protect himself." *Smith*, 355 S.W.3d at 145 (quoting *Hughes v. State*, 719 S.W.2d 560, 564 (Tex. Crim. App. 1986)); *see* TEX. PENAL CODE § 9.33. Both of these defenses—self-defense and defense of others—may be raised as justifications for a defendant's actions and in support of an acquittal against a charge of murder or manslaughter. *See, e.g.*, TEX. PENAL CODE §§ 9.31–.33; *Alonzo v. State*, 353 S.W.3d 778, 779–81 (Tex. Crim. App. 2011) (self-defense is defense to both murder and manslaughter charges); *Smith*, 355 S.W.3d at 145 (defense of third person as defense to murder).

The use of force against another is not justified in response to verbal provocation alone[7] or when the person using force provoked the person against whom the force was used.[8] And the use of deadly force is only appropriate under these defenses to protect the actor or a third person from another's "use or attempted use of unlawful deadly force" or "to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." *See* TEX. PENAL CODE §§ 9.32(a), 9.33.

---

[7]    *See* TEX. PENAL CODE § 9.31(b)(1).

In a claim of self-defense or defense of others, "a defendant bears the burden of production," while "the State . . . bears the burden of persuasion to disprove the raised defense." *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The defendant's burden of production requires the defendant to adduce some evidence that would support a rational jury finding for the defendant on the defensive issue. *See Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013); *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007); *see also* TEX. PENAL CODE § 2.03(c) ("The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense."). "[E]ven a minimum quantity of evidence is sufficient to raise a defense as long as the evidence would support a rational jury finding as to the defense." *Krajcovic*, 393 S.W.3d at 286 (citing *Shaw*, 243 S.W.3d at 657–58). "[A] defense is supported (or 'raised') if there is evidence in the record making a prima facie case for the defense." *Shaw*, 243 S.W.3d at 657. "A prima facie case is that 'minimum quantum of evidence necessary to support a rational inference that [an] allegation of fact is true.'" *Id.* (quoting *Tompkins v. State*, 774 S.W.2d 195, 201 (Tex. Crim. App. 1987), *aff'd*, 490 U.S. 754, 109 S. Ct. 2180 (1989)). By contrast, the State's "burden of persuasion is not one that requires the production of evidence, rather it requires

---

[8]      *See id.* § 9.31(b)(4) (providing general rule and exception).

only that the State prove its case beyond a reasonable doubt." *Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913–14).

In light of these burdens of production and proof, "[w]hen a jury finds the defendant guilty, there is an implicit finding against the defensive theory." *Id.* A jury, however, is not permitted to reach a speculative conclusion. *Elizondo v. State*, 487 S.W.3d 185, 203 (Tex. Crim. App. 2016). Nor is it permitted to disregard undisputed facts that allow only one logical inference. *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006); *Satchell v. State*, 321 S.W.3d 127, 132 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

### 2. Whether there is sufficient evidence that Chris's actions were not justified

Chris adduced evidence that he acted in self-defense or in defense of his family. According to multiple witnesses, Chris received a frantic phone call from his mother that Dominguez was chasing his family on a motorcycle. By several accounts, when Chris came out of the house, Dominguez was punching Braughton Sr. in the face. Braughton Sr. ultimately had a bloody lip. Chris relies on his own testimony and the testimony of his family members and Irving that when he came out of the house with a gun and told Dominguez, "Stop, I have a gun," Dominguez responded by acknowledging, "[Y]ou have a gun," stating that he had "a gun" or "something for" Chris, and moving towards his motorcycle, which prompted Chris to shoot him. In addition, Bannon testified that the overall situation was one in

which Chris was "just trying to defend his dad." This testimony was consistent with the physical evidence presented. As Dr. Gonsoulin testified, the bullet trajectory was at least plausibly consistent with a shot fired while Dominguez was bending or reaching downward with his right hand, as that would expose his armpit if his shoulders were sufficiently extended.

In light of the above testimony, Chris met his burden of production. *See* TEX. PENAL CODE § 2.03(c); *Krajcovic*, 393 S.W.3d at 286; *Shaw*, 243 S.W.3d at 657–58. That is, this evidence, if credited by the jury, would support a rational jury finding that Chris was not guilty because (1) he justifiably acted in self-defense in response to the statement "I got a gun for you" and Dominguez's subsequent motions; (2) he justifiably acted in defense of others, in particular in defense of his father, mother, and younger brother; or (3) both defenses applied.

Because Chris met his burden of production, the State was required to prove beyond a reasonable doubt that his actions were not justified under either defensive theory. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14. Although the State was not required to produce evidence refuting Chris's theories, it still had the obligation to present evidence sufficient to permit the jury to reach its verdict of guilty, implicitly rejecting those theories. *E.g.*, *Alonzo*, 353 S.W.3d at 781 ("If there is some evidence that a defendant's actions were justified under one of the provisions of Chapter 9 [of the Penal Code], the State has the burden of persuasion

31

to disprove the justification beyond a reasonable doubt."); *Zuliani*, 97 S.W.3d at 594–95; *Saxton*, 804 S.W.2d at 913–14.

The jury rationally could have rejected Chris's self-defense and defense-of-others theories. The use of deadly force for defense of third parties is justified only "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the [third party] against [another's] use or attempted use of unlawful deadly force." TEX. PENAL CODE §§ 9.32(a)(2), 9.33. Taking the evidence in the light most favorable to the prosecution, the jury could have discredited the testimony that Mrs. Braughton called Chris before the fight began—testimony that was undermined by the absence of any phone records demonstrating that it occurred or any data retrieved from any phone found at the scene. Although no witness testified that the call did not occur, the jury was free to disbelieve all or any part of any witness's testimony and was not required to accept the testimony of Chris's witnesses, even when those witnesses were not contradicted. *See Sharp*, 707 S.W.2d at 614; *Henderson*, 29 S.W.3d at 623.

In the same light, the cut on Braughton Sr.'s lip and presence of Braughton Sr.'s DNA on Dominguez's hand indicates only that Dominguez punched Braughton Sr. once. Even were we to credit the testimony of Braughton Sr. that he was punched three times, the jury rationally could have concluded that Chris's use of deadly force was not immediately necessary for Chris to protect his father. By

32

all accounts, Braughton Sr. was on the ground after the third punch, and Dominguez had no weapon, was not using his hands as deadly weapons, and was not kicking or jumping on Braughton Sr. And Braughton Sr.'s injuries—a bloody lip—were not serious—indeed, Braughton Sr. did not receive any medical treatment for his injuries. The defense-of-others theory is also undermined by Chris's mother's statement to him to put the gun down and go back inside and her immediate reaction to observing Chris shoot Dominguez: "What did you do?"

Indeed, at the moment of the shooting, Dominguez had ceased using any force at all, and the punches he had landed on Braughton Sr. up to that point do not amount to deadly force that could create a reasonable belief that deadly force was necessary. *See Bedolla v. State*, 442 S.W.3d 313, 317 (Tex. Crim. App. 2014) (distinguishing between purportedly defensive punching as force and running over victim with car as deadly force); *see also Bundy v. State*, 280 S.W.3d 425, 435 (Tex. App.—Fort Worth 2009, pet. ref'd) (stating that "attempt to punch appellant . . . was not deadly force" justifying defensive deadly force); *Schiffert v. State*, 257 S.W.3d 6, 14 (Tex. App.—Fort Worth 2008, pet. ref'd) (holding that reasonable jury could not have found that actor was justified in using deadly force when other person's only use of force was striking with fist); *cf. Rue v. State*, No. 01-11-00112-CR, 2012 WL 3525377, at *3 (Tex. App.—Houston [1st Dist.] Aug. 16, 2012, pet. ref'd) (mem. op., not designated for publication) ("Hands are

not deadly weapons per se, but they can become deadly weapons depending on how the actor uses them."). In sum, Chris adduced no evidence that Dominguez used his hands in a deadly manner or used or threatened to use deadly force of any kind before Chris brought a gun to the encounter.

We next turn to whether the jury likewise could have rationally found that Chris was not justified in using deadly force in light of evidence that Dominguez appeared to be reaching for a gun in the saddlebag of his motorcycle. Chris, Braughton Sr., and Mrs. Braughton each testified that, in response to Chris's announcement that he had a gun, Dominguez responded that he also had "a gun." But each of these witnesses also testified that Dominguez might have said, instead, that he had "something." No witness ever saw a gun in Dominguez's possession, and law enforcement did not recover any weapon other than Chris's gun. Thus, although the jury could have credited testimony that Chris reasonably believed that deadly force was immediately necessary, it was also free to reject the testimony that Dominguez threatened Chris with and attempted to retrieve a gun, particularly when no gun other than Chris's was ever recovered. *Saxton*, 804 S.W.2d at 914.

Chris next assails the testimony of Gina, the neighbor who observed the events unfold from her bedroom window. First, Chris points out inconsistencies between her statement to police and her trial testimony. Second, he argues that her testimony is unreliable because the window covering obstructed her vision. Third,

through his examination of Dr. Gonsoulin, the assistant medical examiner, he attacks Gina's contention that Dominguez was backing up with his arms raised above his head and was not reaching towards his motorcycle's saddlebag when he was shot. Dr. Gonsoulin conceded that—given the path of the bullet which went "basically from the right armpit to the left arm pit" in a "very slightly upward" direction[9]—it was "possible" that Dominguez was "slightly bent" and "reaching" with his right arm when he was shot. Dr. Gonsoulin also testified that the bullet, which came primarily from a shooter facing Dominguez's right side, entered "slightly" from Dominguez's back, not from a gun pointing "straight ahead" at Dominguez's chest. While this possibility was consistent with Chris's testimony that Dominguez was reaching into his motorcycle's saddlebags when Chris fired the gun, this does "not render the State's evidence insufficient [because] the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Id.*[10]

---

[9] She also described the path as "almost straight across" and that the left side was "down by just a hair" or "minimally."

[10] The dissent asserts that Gina's testimony was "irreconcilable with the physical evidence," specifically Dr. Gonsoulin's testimony about the bullet's trajectory. We disagree. As explained above, Dr. Gonsoulin testified that she could not exclude the possibility that Dominguez had his hands up, but could only say that the gun could not have been pointed at his chest from the front. And Gina did not specifically testify that the gun was in front of Dominguez.

Indeed, Dr. Gonsoulin's testimony was in some ways supportive of Gina's account. The area of the bullet's entry under the right armpit generally "is covered whenever that person's arm is down." She testified:

Q.    So let's go back and talk about the gunshot wound. What does the position of the gunshot wound on Emmanuel Dominguez being about right here; is that correct?

A.    A little higher.

Q.    What does that tell you as far as the position of his right arm whenever the bullet entered his body?

A.    At the time of the discharge, his armpit was exposed, which means that his shoulders were at least raised to expose that area of the body.

She also testified that while the armpit would be exposed if someone was reaching far enough, it would not be exposed if someone was reaching across and down because reaching down "cover[s] up that armpit." The inference from this testimony, combined with testimony and photographic evidence that Dominguez's motorcycle was laid on the ground, was that Dominguez likely was not reaching down when he was shot. Chris did not present any expert witness to support his contention that Dominguez was reaching down when he was shot.

Chris urges us to discredit Gina's testimony because Gina was mistaken when she apparently testified that Dominguez was facing Chris when he was shot. But a jury may disregard mistakes by a witness on one portion of the witness's testimony and still credit other portions of the witness's testimony—here that

Dominguez had his hands up. *See Sharp*, 707 S.W.2d at 611; *Henderson*, 29 S.W.3d at 616. Moreover, Dr. Gonsoulin testified that Dominguez could have turned shortly before the shooting.

To the extent that the evidence conflicted regarding Dominguez's orientation with respect to Chris when the shot was fired, the resolution of such conflicts is the province of the jury, and the jury could have resolved such conflicts in a number of ways, including by crediting other parts of Gina's testimony or Chris's own testimony that he was standing to Dominguez's side. *See Bartlett*, 270 S.W.3d at 150 (jury is exclusive judge of facts proved and weight to be given to testimony); *Sharp*, 707 S.W.2d at 614 ("[A] witness may be believed even though some of his testimony may be contradicted and part of his testimony recorded, accepted, and the rest rejected."); *Henderson*, 29 S.W.3d at 623. With the testimony presented, the jury could have believed that Dominguez backed away at an angle to Chris or that, while Dominguez was backing directly away, he turned before the bullet struck him.[11]

---

[11]     The dissent states that Gina's testimony that Dominguez put his hands up and backed away without making any threats is "[t]he only evidence that is inconsistent with [Chris's] defensive theories." We disagree. The evidence shows that Chris had little to no knowledge of unfolding events when he emerged from the house with a gun, that the physical confrontation between Dominguez and Braughton Sr. ended before Chris fired a shot, that Bannon did not see a fight at all, and that Mrs. Braughton made numerous statements from which a reasonable jury could infer that Chris's use of deadly force was unnecessary. These facts, among others, are also inconsistent with Chris's theory that defensive, deadly force was immediately necessary.

37

As we observed in another case involving a claim of self-defense,

> The jury's decision to reject [the] defensive claims . . . ultimately hinges on the credibility of the witnesses. As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. The statements of the defendant and his witnesses do not conclusively prove a claim of self-defense or defense of a third party.

*Smith v. State*, 355 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citations and internal quotation marks omitted).

In conclusion, taking the evidence in the light most favorable to the verdict, the jury rationally could have chosen not to believe Chris and his family's testimony that would have supported a finding that Chris reasonably believed deadly force was immediately necessary to protect himself or third persons from Dominguez's impending attempted use of deadly force. We cannot substitute our view of these witnesses' credibility based on a cold record for that of the factfinder. *Smith*, 355 S.W.3d at 144; *see Brooks*, 323 S.W.3d at 899 (jury is sole judge of witnesses' credibility and weight to be given their testimony). Nor can we conclude that the imperfections in Gina's testimony by themselves are sufficient to conclusively establish a reasonable doubt. *See Williams*, 235 S.W.3d at 750. Even without Gina's testimony, the jury was not required to accept Chris's defensive claims. Indeed, additional testimony—from Gonsoulin, Bannon, and even the Braughtons—cast doubt on Chris's claim that he had a reasonable belief in the need to use deadly force.

38

As an appellate court, our review is limited. First, we review the evidence in the light most favorable to the prosecution. *Saxton*, 804 S.W.2d at 914. Second, we may not "act as a 'thirteenth juror' by overturning a jury's duly-delivered verdict simply because we 'disagree with [that] verdict.'" *Thornton*, 425 S.W.3d at 303. We may set aside the jury's guilty verdict only if no reasonable juror could reach the verdict the jury reached. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Saxton*, 804 S.W.2d at 914. We must affirm, however, if, "after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914. Applying these standards, after reviewing all the evidence, we conclude that legally sufficient evidence supports the verdict, and therefore overrule Chris's second issue.

**Charge Error**

In his third issue, Chris argues that the trial court committed reversible error by refusing his request for an instruction on the lesser-included offense of felony deadly conduct. In response, the State argues that Chris was not entitled to the instruction because there was no evidence to support it. Alternatively, the State argues that any error was harmless because the charge included an instruction on the *intervening* lesser-included offense of manslaughter, which the jury rejected,

indicating that it would have also rejected the *even lesser*-included offense of deadly conduct.

## A.      When a lesser-included-offense instruction is required

The Code of Criminal Procedure provides that an offense is a lesser-included offense of a charged offense if

(1)     it is established by proof of the same or less than all the facts required to establish the commission of the charged offense;

(2)     it differs from the charged offense only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3)     it differs from the charged offense only in the respect that a less culpable mental state suffices to establish its commission; or

(4)     it consists of an attempt to commit the charged offense or an otherwise included offense.

TEX. CODE CRIM. PROC. art. 37.09.

A defendant is entitled to an instruction on a lesser-included offense if the lesser-included offense satisfies a two-prong test. *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016); *Cavazos v. State*, 382 S.W.3d 377, 382–83 (Tex. Crim. App. 2012).

Under the first prong, the lesser-included offense must actually be a lesser-included offense of the charged offense. *Palmer v. State*, 471 S.W.3d 569, 570 (Tex. App.—Houston [1st Dist.] 2015, no pet.). That is, the lesser-included offense must be included "within the proof necessary to establish the offense charged."

40

*Bullock*, 509 S.W.3d at 924; *see Cavazos*, 382 S.W.3d at 382; *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007). Whether a lesser-included offense satisfies the first prong is a question of law, which we review de novo without considering the evidence. *Bullock*, 509 S.W.3d at 924; *Hall*, 225 S.W.3d at 535; *Palmer*, 471 S.W.3d at 570.

Under the second prong, the lesser-included offense must be "a valid, rational alternative to the charged offense." *Bullock*, 509 S.W.3d at 925. To be a valid, rational alternative, the lesser-included offense must be supported by some evidence in the record that would permit the jury rationally to find the defendant guilty of only the lesser charge. *Cavazos*, 382 S.W.3d at 383. That is, there must be "some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense." *Bullock*, 509 S.W.3d at 925.

"Anything more than a scintilla of evidence is adequate to entitle a defendant to a lesser charge." *Id.* Although "the evidence may be weak or contradicted, the evidence must still be directly germane to the lesser-included offense and must rise to a level that a rational jury could find that if [the defendant] is guilty, he is guilty only of the lesser-included offense." *Cavazos*, 382 S.W.3d at 385. Satisfying this standard "requires more than mere speculation—it requires

affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id.*

In reviewing the evidence to determine whether the lesser-included offense satisfies the second prong, "we may not consider '[t]he credibility of the evidence and whether it conflicts with other evidence or is controverted.'" *Goad v. State*, 354 S.W.3d 443, 446–47 (Tex. Crim. App. 2011) (quoting *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1984)). The second prong "may be satisfied if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations." *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011). If the record contains more than a scintilla of evidence from which a jury could rationally find the defendant guilty of only the lesser-included offense, the defendant is entitled to the instruction—even if finding the defendant guilty of the lesser-included offense "would require the jury to believe only portions of certain witnesses' testimony." *Bullock*, 509 S.W.3d at 929.

Whether a lesser-included offense satisfies the second prong is a question of fact, which we review for an abuse of discretion, considering all the trial evidence. *Bullock*, 509 S.W.3d at 929; *Cavazos*, 382 S.W.3d at 383; *Palmer*, 471 S.W.3d at 570.

**B. When the omission of a lesser-included-offense instruction is harmful**

"The erroneous refusal to give a requested instruction on a lesser-included offense is charge error subject to an *Almanza* harm analysis." *Nangurai v. State*, 507 S.W.3d 229, 234 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on rehearing). When, as here, error has been properly preserved, we will reverse if the error resulted in some harm to the defendant. *Nangurai*, 507 S.W.3d at 234.

Ordinarily, if the trial court's refusal to submit an instruction on the lesser-included offense "left the jury with the sole option either to convict the defendant of the charged offense or to acquit him, some harm exists." *Id.* The harm from omitting an instruction on a lesser-included offense "stems from the potential to place the jury in the dilemma of convicting for a greater offense in which the jury has reasonable doubt or releasing entirely from criminal liability a person the jury is convinced is a wrongdoer." *Masterson v. State*, 155 S.W.3d 167, 171 (Tex. Crim. App. 2005). Thus, the submission of an instruction on an intervening lesser-included offense—an offense that is between the requested lesser-included offense and the charged offense—may serve as "an available compromise, giving the jury the ability to hold the wrongdoer accountable without having to find him guilty of the charged (greater) offense." *Id.* When a trial court instructs on one lesser-included offense but refuses to instruct on a separate lesser-included offense, the

43

inclusion of one lesser-included offense "may, in appropriate circumstances, render a failure to submit the requested lesser offense harmless." *Id.*

In determining whether the submission of an instruction on an intervening lesser-included offense rendered the trial court's error harmless, we consider whether the jury rejected the intervening lesser-included offense. *Id.* at 171–72. If the jury rejected the intervening lesser-included offense, and the rejection indicates that the jury legitimately believed that the defendant was guilty of the greater charged offense, the trial court's refusal to submit the requested instruction on another lesser-included offense was harmless. *Id.*; *Saunders v. State*, 913 S.W.2d 564, 573–74 (Tex. Crim. App. 1995) (holding "that because the jury did not opt to convict appellant of involuntary manslaughter, failure to authorize conviction for negligent homicide was harmless"); *Flowers v. State*, No. 01-12-00527-CR, 2013 WL 4081412, at *8 (Tex. App.—Houston [1st Dist.] Aug. 13, 2013, no pet.) (mem. op., not designated for publication) ("[W]hen the jury is charged on a lesser-included offense, albeit not one that the defendant requested, the jury's decision to convict of the charged offense, instead of convicting of the 'intervening lesser-included offense,' may render a failure to submit the requested lesser-included offense harmless.").

We also consider the plausibility of the intervening lesser-included offense. *Masterson*, 155 S.W.3d at 171. If the jury rejected the intervening lesser-included

44

offense, and the intervening submitted lesser-included offense was just as plausible as the requested but refused lesser-included offense, then the trial court's refusal to submit the requested instruction was harmless. *Id.* (explaining that inclusion of instruction on intervening lesser offense does not automatically foreclose harm because in some circumstances intervening lesser offense may be least plausible theory under evidence); *Saunders*, 913 S.W.2d at 573 (explaining that jury's conviction for murder instead of lesser-included offense of involuntary manslaughter does not establish, *a fortiori*, that jury would not have convicted for negligent homicide because jury may have found conscious disregard of risk to be *least* plausible theory under evidence).

Here, the offense charged was murder, the intervening lesser-included offense included in the charge was manslaughter, and the requested even-lesser-included offense omitted from the charge was felony deadly conduct. In descending level of seriousness based on the possible punishment ranges, the offenses were as follows:

| Murder | → | Manslaughter | → | Deadly Conduct |
|--------|---|--------------|---|----------------|
| (1st Degree) | | (2d Degree) | | (3d Degree)[12] |

---

[12]    The punishment range for murder, a first-degree felony, is confinement for life or for any term of not more than 99 years or less than 5 years and a fine not to exceed $10,000. TEX. PENAL CODE §§ 12.32 (establishing punishment range for first degree felony), 19.02(c) (establishing murder as first degree felony). The punishment range for manslaughter, a second-degree felony, is confinement for not more than 20 years or less than 2 years and a fine not to exceed $10,000. *Id.* §§ 12.33 (establishing punishment range for second degree felony), 19.04(b)

A person commits murder if he either (1) "intentionally or knowingly causes the death of an individual" or (2) "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual . . . ." TEX. PENAL CODE § 19.02(b)(1)–(2).

A person commits manslaughter "if he recklessly causes the death of an individual." *Id.* § 19.04(a). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur."[13] *Id.* § 6.03(c).

A person commits third-degree felony deadly conduct "if he knowingly discharges a firearm at or in the direction of . . . one or more individuals . . . ." *Id.* § 22.05(b)(1); *see id.* § 22.05(e).

## C.    Whether deadly conduct is a lesser-included offense of murder

We begin our analysis by determining whether deadly conduct is a lesser-included offense of murder. Chris was charged with committing murder by

---

(establishing manslaughter as second degree felony). And the punishment range for felony deadly conduct, a third-degree felony, is confinement for not more than 10 years or less than 2 years and a fine not to exceed $10,000. *Id.* §§ 12.34 (establishing punishment range for third degree felony), 22.05(e) (establishing felony deadly conduct as third degree felony).

[13]    "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* § 6.03(c).

intentionally and knowingly shooting Dominguez with a firearm, killing him. Murder requires both a more culpable mental state (intentionally or knowingly killing another) and a more serious injury to Dominguez (death) than felony deadly conduct. Thus, deadly conduct by recklessly or knowingly discharging a firearm in the direction of an individual is a lesser-included offense of intentional murder by means of discharging a firearm. *See Ortiz v. State*, 144 S.W.3d 225, 233–34 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). We conclude that deadly conduct is a lesser-included offense of murder as charged in this case.

**D.    Whether the evidence supports a finding of only deadly conduct**

We next consider whether the record contains evidence that "both raises the lesser-included offense" of deadly conduct and "rebuts or negates an element of the greater offense," murder. *See Cavazos*, 382 S.W.3d at 385.

When, as here, a person intentionally points a firearm at or in the direction of one or more people, fires it, and kills a person, "deadly conduct is distinguished from murder . . . only by relieving the State of proving (1) an intentional act and (2) the death of an individual." *Ortiz*, 144 S.W.3d at 234. Thus, to be entitled to an instruction on the lesser-included offense of felony deadly conduct, Chris was required to show that the record contained some evidence that would permit the jury rationally to find that he knowingly discharged a firearm at or in the direction of Dominguez but did not intend to kill Dominguez or cause him to suffer serious

bodily injury. TEX. PENAL CODE §§ 19.02(b)(1)–(2), 22.05(b)(1). While Chris never explicitly testified that he did not intend to shoot Dominguez, he argues that if the jury believed certain portions of his testimony and disbelieved others, it could have rationally found that he knowingly discharged his firearm in the general direction of Dominguez but did not intend to kill or seriously injure him.

The testimony that Chris contends the jury would have to believe to find him guilty of only deadly conduct occurred during his direct examination, when Chris answered the questions of his defense counsel while the two reenacted the shooting:

Q. As [Dominguez] reaches, go ahead and reach as he did.

A. (Witness complies.)

Q. And then did he come up at all?

A. He began to come up.

Q. Go ahead and show that if you would to the ladies and gentlemen of the jury.

A. He reached over (demonstrating). I think I shot him as he was coming up.

Q. I'm you right here. Let's change positions now. I'll be Dominguez. As he's coming up, what are you shooting at?

A. Towards his arm.

Q. When you say "arm," is this it?

A. Yes.

48

Q. This thing here?

A. Yes, sir.

Q. Okay. Is the saddlebag here?

A. Yes, sir.

Other testimony Chris contends the jury would have to believe to find him guilty of only deadly conduct occurred during his cross-examination, when Chris explained why he shot from the hip:

Q. And it's your testimony today you had the gun at your hip?

A. I had it up initially and I just kind of went down.

Q. Is that how you fire at a gun range?

A. No, sir. Like I said, I mean, I wasn't—I just had it pointed towards his arm. I wasn't aiming at a specific area on him.

*        *        *

Q. When you shot him, you were intending to hit him, correct?

A. I was just pointing at his arm. I just wanted to stop him, like I said, sir.

Chris contends that this testimony, combined with several other pieces of evidence, would have permitted a jury to rationally find him guilty of only deadly conduct.[14]

---

[14] According to Chris, this includes evidence that: (1) Chris did not meet Dominguez until the night of the shooting; (2) Chris was inexperienced with firearms; (3) Chris came outside with the gun pointed "in the air"; (4) Chris repeatedly said or yelled, "Stop I have a gun"; (5) Chris fired only once even

49

The potentially inconsistent testimony that Chris contends the jury would have to disbelieve occurred during his cross-examination when Chris answered the prosecutor's questions about Chris's knowledge and intent:

Q.      Well, you had the gun pointed at him and you pulled the trigger, right?

A.      Yes, sir.

Q.      Did you think that a bullet was going to hit Manny Dominguez?

A.      Yes, sir.

Q.      You're aware that a bullet hitting somebody can cause serious bodily injury, correct?

A.      Sometimes, yes, sir.

Q.      So you were aware that—you were aware that you were intending to cause serious bodily injury to Manny Dominguez?

A.      Yes, sir.

According to Chris, the jury could have rationally determined that he was not guilty of murder and was guilty only of felony deadly conduct if it (1) believed his testimony that he shot in the general direction of Dominguez's arm but was not aiming at any specific part of his body, (2) disbelieved his testimony that he intended to hit Dominguez and cause him serious bodily injury, and (3) inferred

though his gun held fourteen rounds; (6) Chris remained at the scene and identified himself as the person who shot Dominguez; and (7) Dominguez was not standing immediately in front of Chris when he fired the gun.

from the evidence that Chris was inexperienced with firearms and intended to shoot in the general direction of Dominguez but did not intend to actually hit him. *See Bullock*, 509 S.W.3d at 926 (noting that jury could have concluded defendant was not guilty of theft and was guilty only of attempted theft if it believed parts of defendant's testimony and disbelieved other parts).

Because Chris did not testify that he shot "at" Dominguez, but only shot "towards his arm," and because the evidence showed that Chris was inexperienced with firearms and shot from a position that compromised his accuracy, Chris argues that his testimony can and should be interpreted as meaning that he only intended to stop or scare off Dominguez, not seriously injure him. For the reasons stated below, we conclude that we need not determine whether Chris is correct.

## E. Whether the omission of a deadly-conduct instruction was harmful

Even if we accept Chris's distinction between shooting "towards" and "at" someone[15] and hold that Chris was entitled to an instruction on the lesser-included offense of felony deadly conduct, Chris is not entitled to reversal because he has not shown that the error was harmful.

First, the trial court included an instruction on an intervening lesser-included offense, and the jury rejected it. The Texas Court of Criminal Appeals has

---

[15] *Compare* WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2014) 1532 (defining "toward" as "in the direction of") *with id.* at 89 (defining "at" as "to or toward as the goal or object").

observed that an appellate court "can conclude that the intervening offense instruction renders the error harmless if the jury's rejection of that offense indicates that the jury legitimately believed that the defendant was guilty of the greater, charged offense." *Masterson*, 155 S.W.3d at 171–72 (holding that denial of instruction on criminally negligent homicide was harmless when jury rejected intervening offense of manslaughter and convicted defendant of capital murder).

Here, the charge included the following instruction on the intervening lesser-included offense of manslaughter:

> Unless you so find from the evidence beyond a reasonable doubt [that Chris is guilty of murder], or if you have a reasonable doubt thereof, or if you are unable to agree, you will next consider whether the defendant is guilty of the lesser offense of manslaughter.

> Our law provides that a person commits the offense of manslaughter if he recklessly causes the death of an individual.

> A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise as viewed from the defendant's standpoint.

> Therefore, if you find from the evidence beyond a reasonable doubt that on or about the 24th day of May, 2013, in Harris County, Texas, the defendant, Christopher Ernest Braughton, did then and there unlawfully, recklessly, as that term is hereinbefore defined, cause the death of Emmanuel Dominguez by shooting Emmanuel Dominguez with a deadly weapon, namely, a firearm, then you will find the defendant guilty of manslaughter.

Thus, the jury was not placed in the position of either convicting for a greater offense in which it had reasonable doubt or releasing entirely from criminal liability a person it was convinced was a wrongdoer. *See Masterson*, 155 S.W.3d at 171. The intervening lesser-included offense of manslaughter served as an available compromise, affording the jury the opportunity to hold Chris accountable without having to find him guilty of murder. *Id.* If the jury believed Chris lacked the requisite intent for murder, it would have convicted him only of manslaughter; its rejection of manslaughter (and Chris's defenses) indicates that it legitimately believed he committed murder. *See id.* at 171–72 (holding that any error caused by not instructing jury on criminally negligent homicide was harmless when defendant was convicted of charged offense of capital murder and jury rejected lesser-included intermediate offense of manslaughter).[16]

---

[16]     *See also Orona v. State*, 341 S.W.3d 452, 462 (Tex. App.—Fort Worth 2011, pet. ref'd) (holding that conviction for murder despite availability of manslaughter showed that jury believed defendant possessed specific intent required for murder); *Flores v. State,* 215 S.W.3d 520, 530–31 (Tex. App.—Beaumont 2007) (holding that any error in not instructing jury on felony murder was harmless when trial court instructed jury on manslaughter and injury to child and jury found defendant guilty of greater charged offense), *aff'd*, 245 S.W.3d 432 (Tex. Crim. App. 2008); *Reed v. State*, No. 01-13-00768-CR, 2014 WL 3697797, at *5 n.3 (Tex. App.—Houston [1st Dist.] July 24, 2014, no pet.) (mem. op., not designated for publication) ("Even assuming that [the defendant] was entitled to the manslaughter instruction, the omission of that instruction was harmless because the jury rejected the lesser-included intermediate offense of felony murder and found sufficient evidence to convict him of the charged offense of capital murder.").

Second, the intervening lesser-included offense that the jury rejected, manslaughter, was just as plausible as the omitted lesser-included offense, deadly conduct. Manslaughter's intent requirement is lower than that of felony deadly conduct. *Compare* TEX. PENAL CODE § 19.04(a) (manslaughter requires proof of recklessness), *with id.* §§ 22.05(b)(1), 22.05(e) (felony deadly conduct requires knowing conduct). And it is undisputed that at the time of his deliberate firing of the gun he had loaded, Chris was aware that he was (1) an inexperienced shooter, (2) shooting at close range, (3) from a posture that compromised his aim, while (4) aiming in the general direction of Dominguez's arm. Accepting Chris's argument that the jury could have concluded that he intended only to scare Dominguez and lacked an intent to actually hit him, it would have been equally plausible for the jury to believe he was reckless about the substantial and unjustified risk that he would actually hit Dominguez and kill him, so as to find him guilty of manslaughter.[17] *See Britain*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) ("Manslaughter is a result-oriented offense: the mental state must relate to the results of the defendant's actions."); *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (noting that examples of manslaughter include "an accidental discharge of a firearm, a lack of intent to kill, or a physical struggle between the

---

[17] The jury's rejection of Chris's claims that he acted in self-defense and in defense of others shows that the risk was unjustified.

defendant and the victim"); *Shanklin v. State*, 190 S.W.3d 154, 159–60 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd) (holding that defendant who "shot in the group's direction" to "scatter" them was entitled to manslaughter instruction); *Hernandez v. State*, 742 S.W.2d 841, 843 (Tex. App.—Corpus Christi 1987, no pet.) (holding defendant who fired "to scare" entitled to involuntary manslaughter charge).

Because manslaughter was just as plausible a theory as deadly conduct, and because the jury rejected manslaughter under the evidence presented, we hold that Chris was not harmed by the trial court's refusal to include his requested instruction on the lesser-included offense of deadly conduct. Accordingly, we overrule Chris's third issue.

**Conclusion**

We affirm the judgment of the trial court.

Harvey Brown
Justice

Panel consists of Justices Keyes, Brown, and Huddle.

Justice Keyes, dissenting.

Publish. TEX. R. APP. P. 47.2(b).