**Opinion filed April 9, 2020**



# In The

# Eleventh Court of Appeals

_____

## No. 11-18-00104-CR

_____

## JOE JOHNSON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 106th District Court**

**Dawson County, Texas**

**Trial Court Cause No. 18-7866**

## MEMORANDUM OPINION

The grand jury indicted Joe Johnson for murder under Section 19.02(b)(1) of the Texas Penal Code. The jury found him guilty and assessed his punishment at confinement for life. The trial court sentenced him accordingly. We affirm.

In his sole issue on appeal, Appellant claims that the evidence was legally insufficient to find him guilty of murder as charged in the indictment and that he should have been acquitted because he acted in self-defense.

On February 16, 2016, Appellant encountered the victim, Dominique Quayshawn Adams. Appellant was accompanied by his friend, Cruzito Gutierrez. According to the testimony of Adams's girlfriend, Kassandra Ramos, Appellant and Adams were formerly friends. Ramos testified that sometime prior to February 16, 2016, while Adams was in jail, Ramos cheated on Adams with Erasmus Watson (Raz). Subsequently, Adams and Ramos resumed their relationship after Adams was released from jail. Ramos testified that Adams was upset with Appellant because Appellant continued to be friends with Raz.

Gutierrez testified that, on the day of the offense, as he and Appellant were walking "to the Stop-N-Go to get some Cokes," they saw Adams and Ramos driving around together. Gutierrez testified that he told Appellant, "There's Dominique right there," and that Appellant replied, "I got to dump him."

Similarly, Ramos testified that she and Adams noticed Appellant and Gutierrez. When they got closer to Appellant and Gutierrez, and as the car came to a stop, Appellant made a motion with his hand that indicated that he wanted Adams to roll down his window. Adams then asked Appellant, "What's up?" Gutierrez testified that Adams also asked Appellant "if he still want[ed] that beef s--t," meaning that Adams and Appellant were in disagreement about something. In response, Appellant then told Adams that they, Adams and Ramos, had "better leave or it was going to end bad for both of [them]." Adams did not have a gun on his person or in the car. In addition, Gutierrez testified that he never saw a gun in Adams's hand.

Ramos testified that, at that point, Adams parked the car and that, as soon as Adams stepped one foot out of the car, Appellant began to shoot; he shot Adams. After Appellant shot Adams, Appellant and Gutierrez ran away from the scene and to Appellant's house. Luisa Florez, the forensic pathologist who performed the autopsy on Adams's body, testified that Adams had two gunshot wounds, one to the

left leg and one to the back. Florez determined that the cause of death was the gunshot wound to the back.

At trial, when the State rested its case-in-chief, Appellant moved for a directed verdict, which the trial court overruled. Appellant testified in his own defense. He testified that the reason he had a gun with him on the day of the offense was because of an encounter with Gutierrez's neighbor earlier that morning. He stated that he believed that his life was threatened and that he did not want to "walk around without a weapon."

In addition, Appellant claimed that he shot Adams in self-defense and testified that he had had three prior "interactions" with Adams. The first incident occurred when Appellant was walking one day and Ramos and Adams pulled up next to him in a car. Appellant claimed that Adams got out of the car and asked Appellant if he wanted to fight. Appellant said that he could see that Adams was holding something behind his back and that he assumed that it was a gun; he decided to keep walking. Appellant also testified that he had a gun at this time and that he could have shot Adams then if he had wanted to. Ramos corroborated this incident in her testimony, but she did not corroborate Appellant's assertion that Adams was holding something behind his back during the incident.

Appellant claimed that the second incident occurred one night as he walked home from his girlfriend's house. He noticed that a car was coming up behind him. Appellant testified that the car began to slow down and that he heard a voice he recognized as Adams's say, "Hey, what's up with that." Appellant immediately ran away. Appellant claims that, as he ran away, he heard gunshots.

Appellant testified that he encountered Adams for a third time as Appellant was walking. Adams drove toward Appellant and said, "What's up with that." Again, Appellant immediately ran away. When Appellant ran into a nearby alley, he heard gunshots and assumed that "[Adams] was letting [Appellant] know

3

[Adams] had a gun or was coming after [Appellant] or something." No other witnesses corroborated the second and third incidents, and Ramos testified that she never saw Adams shoot at Appellant.

Appellant denied that, on the day of the offense, he motioned for Adams to roll down his window. Appellant also denied that he initiated a conversation with Adams. Appellant maintained that Adams initiated the confrontation. Appellant stated that he did not want to shoot Adams but that, as he turned to walk away, he saw Adams start to reach down and believed that Adams was reaching for a gun. Appellant testified that Adams had had a gun in their encounters in the past. Appellant also thought to himself at this time, "He's not only going to shoot me; I have another person with me too," meaning Gutierrez. Indeed, Appellant testified that he "reasonably believe[d] that [Adams] had a weapon and he was going to commit the offense of murder against [Appellant] and/or [Gutierrez]." Appellant testified that he was scared for both his and Gutierrez's lives. Appellant insisted that he intended to shoot low at the door to give them time to run away.

Appellant also testified that the gun found in his home was not the gun he used to shoot Adams and that he did not remember what happened to the gun. Lieutenant Darrel Williams testified that Gutierrez had said during an interview that, when he and Appellant arrived at Appellant's house after the shooting, Appellant went outside, hid the gun, then came back inside without the gun. However, at trial, Gutierrez denied that he ever saw Appellant go outside with the gun.

In his sole issue on appeal, Appellant claims that the evidence was legally insufficient to convict him of murder and that he should have been acquitted of murder because he acted in self-defense or in defense of a third person.

"When determining whether the evidence is sufficient to support a criminal conviction, the only standard an appellate court should apply is the *Jackson v. Virginia* test for legal sufficiency." *Cary v. State*, 507 S.W.3d 761, 765–66 (Tex.

4

Crim. App. 2016); *see Jackson v. Virginia*, 443 U.S. 307 (1979). This means that we must review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Thompson v. State*, No. 11-16-00300-CR, 2018 WL 4925733, at *2 (Tex. App.—Eastland Oct. 11, 2018, pet. ref'd) (mem. op., not designated for publication). Thus, we must "defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

In addition, we defer to the factfinder's resolution of any conflicts in the evidence and presume that the factfinder resolved such conflicts in favor of the verdict. *Jackson*, 433 U.S. at 326; *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When we review the sufficiency of the evidence, we look at "events occurring before, during, and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

When we review the sufficiency of the evidence when the jury rejected a self-defense or defense-of-others claim, we "determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Braughton v. State*, 522 S.W.3d 714, 727 (Tex. App.—Houston [1st Dist.] 2017), *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2018) (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)). This is because when the defendant has raised a justification defense, and "a jury finds the defendant guilty,

there is an implicit finding against the defensive theory." *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).

As we have said, Appellant was indicted for murder under Section 19.02(b)(1) of the Texas Penal Code. A person commits murder under this section if the person "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2019). A person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2011). A person acts knowingly "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

Appellant claims that he acted in self-defense and in defense of a third person. Use of force against another is justified "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). In the same manner, the use of deadly force against another is justified under the above circumstances and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). The use of force or deadly force against another to protect a third person is justified if the actor would be justified in using force or deadly force to protect himself and the actor "reasonably believes that his intervention is immediately necessary to protect the third person." *Id.* § 9.33. Or, stated another way, "A person is justified in using deadly force in defense of others '[s]o long as the accused reasonably believes that the third person would be justified in using [deadly force] to protect himself.'" *Braughton*, 522 S.W.3d at 730 (alterations in original) (quoting *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd)).

The use of force against another is not justified under a number of circumstances, including the following: when the use of force is in response to verbal provocation alone, if the actor provoked the other's use or attempted use of unlawful force, or if the actor sought a discussion with the other person "concerning the actor's differences with the other person" while the actor unlawfully carried a weapon in violation of Section 46.05 of the Texas Penal Code. PENAL § 9.31(b)(1), (4), (5).

Here, there was sufficient evidence for the jury to find the essential elements of murder beyond a reasonable doubt. For example, as previously stated, a person commits murder if the person "intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1). The jury, in this case, heard evidence that Appellant caused Adams's death by shooting Adams in the back. Further, because Appellant testified that he did in fact point his gun in Adams's direction and pull the trigger, a rational juror could have inferred Appellant's intent to kill because he was using a deadly weapon in a deadly manner. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993). Thus, we find that a rational juror could have concluded that Appellant caused Adams's death and that he had the necessary intent to do so.

Further, although Appellant testified that he believed Adams would kill both him and Gutierrez and that Appellant acted in self-defense and in the defense of Gutierrez, the jury apparently did not believe him. The jury, as the factfinder, was entitled to draw its own conclusions from the evidence and was not required to accept Appellant's defense claims as true. *Rodriguez v. State*, 546 S.W.3d 843, 860 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). Thus, we overrule Appellant's sole issue on appeal.

We affirm the judgment of the trial court.


JIM R. WRIGHT

SENIOR CHIEF JUSTICE


April 9, 2020

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[1]

Willson, J., not participating.

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.