

# NUMBER 13-19-00623-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**AMBER NICOLE SORENSON,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 24th District Court
### of Jackson County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva
Memorandum Opinion by Justice Benavides**

By one issue, appellant Amber Nicole Sorenson challenges her conviction for

aggravated assault with a deadly weapon against a person with whom she had a dating

relationship, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(b)(1). Sorenson

argues that the evidence was insufficient to support the jury's rejection of her self-defense

claim. We affirm.

## I. BACKGROUND

Sorenson was indicted on four counts regarding the death of Jarrett Parker on February 7, 2017: (1) murder, a first-degree felony, *see id.* § 19.02(b)(2); (2) aggravated assault with a deadly weapon against a person with whom she had dating relationship, a first-degree felony, *see id.* § 22.02(b)(1); (3) aggravated assault with a deadly weapon causing serious bodily injury, a second-degree felony, *see id.* § 22.02(a)(1)(2); and (4) manslaughter, a second-degree felony, *see id.* § 19.04.

At trial, the State presented evidence from law enforcement officials and multiple statements made by Sorenson throughout the course of the investigation, including: (1) Sorenson's 911 call, (2) her video statement to Officer Michael Yaws of the Edna Police Department on February 7, 2017, when he arrived at the house, (3) her interview with Edna Police Department Captain Bruce McConathy on February 7, 2017, (4) her later interview on February 9, 2017, with Chief Clinton Wooldridge and Investigator Kent Bubela of the Edna Police Department, and (5) her grand jury testimony. Travis County Deputy Medical Examiner Leisha Wood described Parker's injuries. She explained that Parker died of a gunshot wound to the chest, which did not appear to be a close-range injury. The bullet lodged in Parker's spinal cord, which would have caused paralysis. Wood opined that Parker "most likely died within minutes," and his toxicology screen showed alcohol and bupropian, a medication usually prescribed for depression and to quit smoking.

Officer Yaws was the first to arrive at the scene, which he believed he arrived

around 12:50 a.m., and encountered Sorenson with blood on her hands, chest, and face. Officer Yaws stated that Sorenson was frantic, hyperventilating, and yelling when he first spoke with her. She told him that she and Parker had been fighting, Parker hit her, and she had to shoot him. When he first entered the master bedroom, Officer Yaws described Parker as laying on his back, feet positioned under the bed, with blood all over his face, hands, and chest, with blood on the walls, floor, and bed, and the gun laying on the bed. Parker was not breathing and had no pulse. Emergency medical services (EMS) arrived shortly after and attended to Parker, while Officer Yaws spoke to Sorenson and took photographs of her and the crime scene. He stated that the walls of the bedroom appeared to have wine splattered on them and he thought it looked like the bed had been moved. Officer Yaws also noted that there was an open paint can sitting on the bathroom counter and Parker appeared to have paint on his hands.

In an interview captured by Officer Yaws's body camera, Sorenson stated:

[Parker] beat my head in;

[Parker] had a gun and I took it from him and I shot him;

[Parker] came outside and he was just mad that I was talking to his mom and so I came inside and he threw me on the ground, and he does this all the time. He threw me on the ground . . . .;

He put . . . he beat my head in . . . [w]ith his fist and the gun came out . . . [Parker] ha[d] a gun out and he held it to my head and I . . . and he . . . and I grabbed the gun and pointed . . . . I thought I was just gonna shoot the window.[1]

Captain McConathy arrived at the scene and took Sorenson to the police station. During

---

[1] The jury was provided with transcripts of each of the statements while it was being played. While the jury returned the transcripts following each statement's playing, the transcripts were submitted into evidence. The statements quoted in this memorandum opinion are taken from those transcripts.

their videotaped interview, which was played for the jury, Sorenson stated:

> [My son] was sick. And so, I was home with him all day, and so [Parker and I] started arguing once [the kids] went to bed and [Parker] started arguing about how I didn't make enough money and he was tired of having to pay all the rent and pay all the bills, [Gasps][,] and so he got mad. [Cries] It doesn't matter what he's mad about. And so, I started getting mad back at him, and he gets very frustrated and very angry[;] he has to be on medication, so he always punches me in the back of the head[,] and if I fight back[,] he fights me back. And he always has his gun by him on the floor, and he put it . . . I knew he wasn't gonna shoot me. [Cries].
>
> [Parker] bent me over the bed, and he had [the gun] to my head, and he always beats my head. [Gasps][.] So, he had it to my head, and he's done it before so I [Sighs] . . . [.] He had it to my . . . to my head, and he was beating my head, and then he had [the gun] to my [Sighs] head, and then he had his arm around my neck, and he's choked me out before, so then he walked around the bed, and he had his gun still on the bed and I grabbed it, or knocked it out and grabbed it, and I thought I was just gonna shoot a window [Cries] but I didn't. I didn't mean to shoot him.

Sorenson explained that Parker took Wellbutrin for anger issues and post-traumatic stress disorder following his military service in the United States Air Force. She stated that Parker "always loses control" but that "his parents" and she "bring him back." Sorenson said she never called the police and instead called Parker's parents.

In response to Captain McConathy's question regarding the window she shot at, Sorenson explained that "[i]t was a window behind him in the bathroom. [Sniffles][.] I didn't even know what I was doing, I was just so scared." She told Captain McConathy that Parker had "choked her out" before, and he had his arm around her neck at one point, so that is why she was scared. Sorenson also indicated that it was not the first time Parker had used the gun to threaten her. She described the incident again and stated:

> And he bent me over and with, uh, with his fist, I don't think the gun was in his hand, but he just hit me on the back of the fi [sic] . . . on the back of the head with his fist. He always does that 'cause you can't see it. And he, I

4

guess, had the gun, [be]cause he still had me over, but he had it to my head [Cries] and he was just talking, I don't know, he was like, 'Go back to Will [her ex-husband] if that's what you wanna do. Go back to Will.' And then he pushed my head down and he hit me again and I socked him. And when I had the gun, [Sniffs][.] I hit him . . . I hit him again, and he hit me, and I grabbed the gun [be]cause it fell and then I pointed at what I thought was [Cries] [Inaudible] window behind him. And I shot it and he . . . then he started bleeding on the . . . the right side.

And I tried, [Cries] I ran over and I tried and I just, I held it and I tried and I called. I had to run and get my phone and . . . and call 911 and try. And I tried and I tried and I tried and I tried and it would not stop bleeding and it was everywhere. And I tried to shake him . . . he would never talk to me and he was . . . [Sobs][.] I didn't mean to shoot him, I didn't mean to shoot him. And I was just tired. We always have good days, and then he just blows up.

Sorenson stated that Parker's anger was "always" directed towards her and never towards her children. As the conversation progressed, Captain McConathy stated that Sorenson previously recounted that she hit Parker's arm and he dropped the gun. Sorenson agreed and said:

Yeah. He had me bent over the bed, and to my head, and he was hitting me with his other hand, and I was hitting back, and he was on top of me crawling over, and I hit him, and he was on the other side of the bed and I . . . The gun was on the bed and I grabbed it and that's when I thought I was gonna shoot the window.

. . . .

I did not intend to shoot him.

. . . .

It wasn't even aimed at him. Like, I'm not . . . [a]t his body. I was just aiming it, and I was so mad at him, and he was so mad at me, and he had it to my head and . . . [.] It does not excuse anything; it doesn't excuse anything at all. He's not a bad person. He was not a bad person. We were gonna buy a house. We were gonna move. He just had these little moments where he would get so mad.

Sorenson described jealousy as the emotion that triggered Parker's anger and explained

5

he "felt left out" because of the relationship between her, her children, and their father, her ex-husband. Parker did not like Sorenson speaking to her ex-husband regarding the children and wanted to be the "head of the household." She also stated that earlier in the fight, Parker had thrown wine at her and he had done that before.

Following Captain McConathy's testimony, Chief Wooldridge testified that when he arrived at the scene on February 7, Sorenson was "covered in blood," hysterical and grief-stricken, and had a hard time talking. He explained that he oversaw the crime scene and that the walls of the bedroom appeared to be covered in dried wine. Chief Wooldridge also discussed interviewing Sorenson on February 9, 2017. She stated initially Parker was upset because he did not think Sorenson's teenage son was sick and should not be staying home. Sorenson explained that she fell asleep after working all night and Parker went to his college courses. Parker texted Sorenson shortly before his 10 a.m. class started and told her he was not going to put her on the deed of the house they wanted to buy until she "was able to pay more of the bills." Sorenson stated that "[Parker] said I wasn't motivated to do anything anymore and [Cries] . . . and just, he was just being so mean, and so I was mad when I was tired." She explained that they had discussed ending their relationship if the house situation did not "work out" for them. Parker and Sorenson texted back and forth throughout the day regarding the issues they were having in their relationship, such as Parker's jealousy and bruises Sorenson had from their prior altercations. As Sorenson described the bruises she said Parker inflicted on her, Chief Wooldridge stopped the interview and had a female staffer take photographs of bruises visible at that time on Sorenson.

When the interview resumed, Sorenson stated that her kids and Parker all returned home around 7:00 p.m. and they played a board game until around 10:00 p.m. Sorenson went outside and called Parker's mother to discuss Sorenson's oldest son's failing grades at school. Sorenson spoke to Parker's mother and younger brother, who was in school with Sorenson's oldest son, for about 45 minutes. When she came inside, Sorenson said Parker was upset because he thought she had been talking to her ex-husband, and even though she explained it was his mother, he continued to be upset and threw wine at her.

Afterwards, they continued to argue:

He said, 'Well, f[***],' and then . . . and, 'shit.' He said, 'Oh, well, shit,' and so he went into the living room and he was yelling and he was just saying . . . just slamming the door to the bedroom. And so, I was just sitting there crying and he came back in and he had another glass of wine and . . . and I told him, I was like, 'You're not gonna do this.' I said, 'You're always mad at me for Will and you . . . you have to let me talk to him,' and he threw it at me again on other door [sic]. And then he grabbed me by my hair [Cries] and threw me on the floor. And then I got up and when I got up he punched me and then grabbed my hair again, and then pulled me to the other side of the bed.

Sorenson described how he pushed her to the floor and punched her in the chest when she got up. She said that Parker then grabbed her by her hair and drug her to the bed when he pushed her face first and began hitting her in the back of the head, while holding her down. Sorenson stated she was screaming but her face was in the mattress. She stated that Parker was hitting her in the head and then she felt "that [Parker] had his gun" and kept saying "How's this for head of household, b*****?" Sorenson claimed Parker was on top of her straddling her and seemed to be "crawling over me," so she hit his arm and grabbed the gun. When she looked up, Parker was standing in the doorway of the bathroom facing her and she described his face as "so mad at me, his face was so mad."

7

Sorenson stated:

> And I just didn't even think, I just shot, I thought I was just gonna shoot the window.
>
> . . . .
>
> He was just so mad. I know he was gonna do something.
>
> . . . .
>
> He just looked at me and he just, like, walked like he was gonna come at me, but . . .

Sorenson said Parker was standing up straight and she was on her knees "standing up" on the bed, and that she thought she was higher than he was. She explained, "I thought if he got the gun again that he would shoot me. [Cries][.] I don't know and I don't know why it wasn't on safety, I don't know why."

Investigator Bubela was present and asked Sorenson some questions regarding previous injuries she claimed were caused by Parker, such as a broken finger, torn cartilage on her ear, and being "choked out." Sorenson said the injuries occurred, but she never went to a doctor to be examined for them. Although they argued and fought in the past, Sorenson exclaimed, "it was never this bad. I never had a gun to my head. [Cries][.] He never used his gun, he never used his gun." She described that she grabbed her phone and called 911 while putting pressure on the wound to his chest.

When asked about the paint can found in the bathroom, Sorenson clarified that she had not seen Parker painting, but thought he was cleaning the wine off the bathroom doors; she did not know why the paint was in the bathroom. She could not explain why there was not paint on the gun since Parker had paint on his hands.

8

After the interview was played for the jury, Chief Wooldridge testified that Sorenson described the altercation "differently a couple of times" but was consistent with respect to one detail: "she grabbed the gun." He stated that he could not understand how it was physically possible for Sorenson to take the gun from Parker based on what she said. He also described an unfired bullet that was found on the bedroom floor and believed that because Parker had military training, it made more sense that Sorenson "racked" the slide with a bullet already in the chamber rather than Parker. Chief Wooldridge also explained that he did not see that Sorenson had injuries to back up her claim of a violent assault and that the bedsheet was not disturbed to support that theory. He did notice that the bed was "shifted" away from the bathroom. He also testified that during his interview with Sorenson he still believed it could have been self-defense.

Investigator Bubela also testified. He stated that he did not feel that the pictures showed any injuries that lined up with the assault Sorenson described. After reviewing text messages from both Sorenson and Parker's phones, Investigator Bubela explained that the texts from February 6 showed the two were fighting over finances most of the day. Sorenson's text messages also made reference to a Facebook post[2] from February 4 that Parker had made and she said maybe she should "just shoot" Parker. Investigator Bubela also stated that even though Sorenson had initially said she was not drinking on February 6, her blood alcohol content was a .164, nearly two times the legal limit.

During her grand jury testimony, which Investigator Bubela was present for,

---

[2] In the Facebook post, Parker spoke of what he characterized as "liberal logic" and "idealism." At the end of the post, he stated: "BTW You all have permission to shoot me with a hi-point [gun] if I ever lose my damn mind and think this way."

Sorenson said that she and Parker went to high school together but reconnected and started dating in the fall of 2015. Parker moved in with Sorenson around March or April 2016. Sorenson recalled two instances where Parker spent the night with his parents: one night being after a wedding on New Year's Eve 2016 and another night in January 2017, shortly before his death. At the wedding, Sorenson said Parker became upset that she was dancing with her wedding party escort, confronted her on the dancefloor, and on the way home, began fighting with her and "beat" her head on the dashboard. When he stopped to smoke a cigarette, Sorenson called Parker's mother to meet them at the house. She stated they had both been drinking at the wedding, and she had about six or seven whiskey and cokes. Parker's parents met them, and Parker left with his parents. Sorenson testified that after that incident, she asked him to get medication, and Parker was prescribed Wellbutrin and Xanax. She described another incident in January 2017 where they had gotten into an argument, and Parker left to his parents' house. She had packed up some of his clothes in boxes, and Parker and his stepfather came and picked them up. Sorenson claimed she did not intend for him to leave permanently and he had planned to take those boxes to his parents' house.

During her grand jury testimony, Sorenson said that, though they never argued over money, Parker would "get mad sometimes if [she] didn't make enough like . . . but it was never a huge argument." When focusing on the day of the shooting, Sorenson explained that Parker had left for school and was texting her wondering if her son was really sick and saying that she "wasn't making enough money for us to have to deal with that . . . ." Later that day, Sorenson stated she had a whiskey and coke drink around 7

10

p.m. She testified that she and Parker got into an argument when he arrived home because she had been texting her ex-husband about their oldest son's failing grades, but he cooled off and the family played a board game. Sorenson admits she was still drinking at that time but later stated she only had two drinks total. She said a little after 10 p.m., she called Parker's mother to discuss their sons who played on a baseball team together and were both failing classes. When Sorenson came inside the house, Parker was in the master bathroom and they started arguing about her son and her ex-husband. According to Sorenson, at some point during that argument, Parker started punching her in the face and then grabbed her arm and punched her in the chest, causing her to "lose her breath" and fall down. After she got back up, Parker threw a glass of wine on her. She stated she then went out on the back porch and Parker stayed inside listening to music. When Sorenson did not hear the music anymore and "thought [Parker] [had] calmed down," she went back inside to "find him wiping the [bathroom] door." As soon as he saw her, he came towards her and grabbed her hair, which was up in a bun. Parker's actions caused her to drop her cell phone as he was "dragging" her by her hair. Sorenson said he pushed her on the bed, face down, and her feet were not on the floor. Parker climbed on top of her, "straddling" her, and was hitting her with his fist. Sorenson stated she could not move her face but was able to move her arms and was swinging them around trying to move. She testified that Parker began yelling at her saying, "I'm head of this household," and she felt something at her head but did not know what it was. He stopped hitting her and crawled off of her, so she got up and saw the gun on the bed. Sorenson explained that as she got up on her knees, in an upright position, she grabbed the gun. She saw Parker

11

was "turning and coming towards [her]. . . And so I just . . . I just shoot it." The grand jury bailiff racked the pistol to demonstrate the sound it makes, but Sorenson said she did not remember hearing that sound that night. The prosecutor asked her about the shooting again and Sorenson stated, "[Parker] was coming towards me and I didn't want him to take the gun" and she nodded in agreement when asked "but at that point, you're in control, right?" Sorenson relayed that after she shot the gun, "I opened my eyes and I see him on the ground,[ ]so I run to him." Parker was bleeding from his chest, so she applied pressure and called 911. Sorenson explained that she did not "give compressions to him, [because] he would have kept bleeding."[3]

The prosecutor stated that Sorenson had "given a couple of other statements to the police, uh, you know that they're somewhat different, right?" Sorenson shook her head to indicate "no". Sorenson went on to say that "[Parker] was standing straight up coming towards me . . . . I couldn't have got out of that room without him coming towards me." When asked what was different about that night as compared to the other times they had fought, Sorenson said, "[Parker] had never attacked me . . . [.] It was . . . I would let him calm down and, but when he hit me that night, his eyes were so mad . . . and he was scary. He was very scary." One of Sorenson's final statements to the grand jury was "I thought I shot the window."

Debra and Daryl Taylor, Parker's mother and stepfather, testified about their interactions with Sorenson. She recounted the phone call with Sorenson after the New Year's Eve wedding. Sorenson called her and said Parker was "bad," had "threatened to

---

[3] Sorenson was a licensed vocational nurse (LVN).

12

kill [Sorenson]," and begged Debra to come help. Sorenson told Debra that Parker got upset that she had been dancing with a groomsman and that he "dragged her" off the dancefloor by her "hair."[4] When the Taylors arrived at Sorenson and Parker's home, Parker seemed fine and not angry or intoxicated, but Sorenson was disheveled, drunk, and her makeup suggested she had been crying. After speaking to both Sorenson and Parker, the Taylors and Parker left to their home together and Sorenson stayed at her home. Debra also spoke of the phone call between Sorenson and herself on February 6. Debra agreed that Sorenson called to discuss their children's grades and they talked for about forty-five minutes but stated that Sorenson sounded "very drunk" and was slurring her words. Debra testified that she never saw Sorenson with injuries, that Sorenson never called her about Parker's anger except on New Year's Eve, and that Sorenson never spoke to her about violence in Parker and Sorenson's relationship.

Daryl testified about his interactions with Sorenson on multiple occasions. He recalled the prior Thanksgiving holiday where Sorenson demanded to leave the family gathering after drinking wine, even though there were family members present that Parker had not seen in years. He explained that Sorenson got upset when she found out she could not be on the Veterans Affairs (VA) home title since they were not married. Parker told him that since Sorenson found out about the home loan, she drank and smoked more and wanted to fight and be violent. Daryl recounted an incident on January 26, 2017, where Parker had come over to the Taylors' house following an argument with Sorenson.

---

[4] Other testimony presented about the New Year's Eve wedding incident supported the statement that Parker had confronted Sorenson and her wedding escort on the dancefloor, but Sorenson had walked off on her own accord, separate from Parker.

Daryl told Parker to call Sorenson and talk it through, but when she answered, Daryl could hear her screaming. Parker told Daryl that evening that Sorenson had gotten "drunk" and threatened to "kill him" with a kitchen knife when he suggested she stop drinking. Daryl stated that he went with Parker to the house to get boxes that Sorenson had packed, and she began arguing with Parker until she noticed Daryl was there. Regarding the New Year's Eve incident, Daryl said when he was speaking to Parker away from Sorenson, he noticed that Parker had scratches all over his arm. Daryl did not believe that Sorenson appeared to have any injuries that lined up with her account of Parker's actions.

The State's final witness was Texas Ranger Drew Pilkington. Ranger Pilkington testified that he was asked to come in and provide assistance to the Edna Police Department. He began by analyzing Sorenson's statements and came up with a hypothesis regarding what had happened. Following that analysis, Ranger Pilkington took measurements of the bedroom and of Sorenson. By using those numbers, Ranger Pilkington believed he determined the placement in the bedroom of Sorenson and Parker which was necessary to match up with the angle of the bullet trajectory that the medical examiner had determined. Through photos and diagrams Ranger Pilkington created, he testified that Sorenson's description of Parker standing in the bathroom doorway was unlikely. His analysis led him to believe that Parker was most likely on the floor in a sit-up position when he was shot, and photos taken from the crime scene and his blood splatter analysis supported that hypothesis.[5] Ranger Pilkington also explained that based on the

---

[5] Ranger Pilkington stated that the medical examiner had determined the bullet entered Parker's body in an angle "close to 45 degrees." According to Ranger Pilkington, if Parker had been standing like Sorenson described, the entry angle would have been closer to 15 degrees, unless he was leaning over substantially. Ranger Pilkington noted that Sorenson never described Parker in that position.

14

trajectory of the ejected shell casing found in the bedroom, Sorenson held the gun at a slight angle, "around 30 degrees or so," instead of a straight up-and-down position. There was also an open paint can found in the bathroom and paint on Parker's hands. Ranger Pilkington explained how he tested his hypothesis about the lack of paint transfer on the gun. Using a pair of deerskin gloves, which he believed "replicated that of [] human skin," Ranger Pilkington painted them with the same type of paint found at the scene and after waiting twenty-four hours, he had another person attempt to take the gun from him while wearing the painted gloves and found that the paint transferred. The gun in this case had no paint transfer on it, which Ranger Pilkington believed refuted Sorenson's theory that she took the gun from Parker.

After both sides rested and closed, the trial court included a self-defense instruction in the jury charge. The instruction stated:

> Upon the law of self-defense, you are instructed that a person is "justified" in using force against another when and to the degree she "reasonably believes" the force is immediately necessary to protect herself against another's use or attempted use of unlawful force. The use of force against another is not justified in response to verbal provocation alone.

The instruction explained when a person would be justified in using deadly force and defined "reasonably believes" and "deadly force." The instruction further stated:

> You are further instructed that it is your duty to consider all relevant facts and circumstances surrounding the alleged killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the alleged offense.

The jury found Sorenson not guilty of murder but guilty of aggravated assault with a deadly weapon to a person with whom she was in a dating relationship. *See* TEX. PENAL CODE

15

ANN. §§ 19.02(b)(2); 22.02(b)(1). The jury sentenced Sorenson to twenty-five years' imprisonment. This appeal followed.

## II. JURY'S REJECTION OF SELF-DEFENSE EVIDENCE

By her sole issue, Sorenson argues that the evidence was sufficient to justify her use of deadly force to defend herself. We construe this argument as challenging the sufficiency of the evidence to support the jury's rejection of her self-defense claim.

### A. Standard of Review and Applicable Law

The penal code provides that deadly force used in self-defense is a defense to prosecution for murder if that use of force is "justified." *See id.* §§ 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."), 9.31–.33 (setting forth substantive requirements for establishing claim of self-defense or defense of third person); *Braughton v. State*, 569 S.W.3d 592, 606 (Tex. Crim. App. 2018).

Texas Penal Code § 9.31 states that, subject to certain exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id.* § 9.31(b). A "reasonable belief" in this context is defined as one "that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

A person is justified in using deadly force against another:

(1)     if he would be justified in using force against the other under Section 9.31; and

(2)     when and to the degree the actor reasonably believes the deadly force is immediately necessary:

16

> (A)    to protect the actor against the other's use or attempted use of unlawful deadly force; or
>
> (B)    to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

*Id.* § 9.32(a). The actor's belief that the deadly force was immediately necessary is presumed to be reasonable under certain circumstances, including if the actor "'knew or had reason to believe that the person against whom the deadly force was used" was committing or attempting to commit one of several enumerated serious felony offenses, and the actor did not provoke the person against whom the force was used and was not otherwise engaged in criminal activity, other than a Class C misdemeanor traffic violation.'" *Braughton*, 569 S.W.3d at 607 (quoting TEX. PENAL CODE ANN. § 9.32(b)).

In determining the sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19, (1979)); *see Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010). "We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge." *Braughton*, 569 S.W.3d at 608; *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). This familiar standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). This Court must "determine[] whether the necessary inferences made by the trier

17

of fact are reasonable, based upon the cumulative force of all of the evidence." *Id.*; *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Braughton*, 569 S.W.3d at 608; *Brooks*, 323 S.W.3d at 922; *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Braughton*, 569 S.W.3d at 608; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see Brooks*, 323 S.W.3d at 899 (a reviewing court must not sit as "thirteenth juror"; disagree with the jury's "weighing of the evidence"; or "disagree with a jury's resolution of conflicting evidence"). A reviewing court is thus "required to defer to the jury's credibility and weight determinations." *Brooks*, 323 S.W.3d at 899; *see Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). "Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.'" *Evans v. State,* 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)). However, juries are not permitted to come to conclusions based on "mere speculation or factually unsupported inferences or presumptions." *Hooper*, 214 S.W.3d at 15–16 (explaining that speculation is "theorizing or guessing about the possible meaning of facts and evidence presented").

Texas Court of Criminal Appeals precedent holds that, "in a claim of self-defense or defense of third persons that would justify a defendant's use of force against another,

18

the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Braughton*, 569 S.W.3d at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)); *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991). "The defendant's burden of production requires [her] to adduce some evidence that would support a rational finding in [her] favor on the defensive issue." *Braughton*, 569 S.W.3d at 608; *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). By contrast, the State's burden of persuasion "is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt." *Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913). Thus,

> [i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914. In *Saxton*, the court of criminal appeals explained that the issue of self-defense is an issue of fact to be determined by the jury, and that "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id.*

### B.    Discussion

"By [the] implicit rejection of [Sorenson's] defenses in finding [her] guilty, the jury necessarily signaled its disbelief in [her] statements as lacking in credibility, and the legal sufficiency standard does not permit us to substitute our view of the credibility of the witness testimony for the jury's." *Braughton*, 569 S.W.3d at 611. However, "[a] jury's

19

decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all of the evidence." *Id.*; *see Adames*, 353 S.W.3d at 860. "Moreover, a jury is not permitted to disregard undisputed objective facts that can support only one logical inference." *Braugton*, 569 S.W.3d at 611; *Brooks*, 323 S.W.3d at 907.

Sorenson was charged with murder, two counts of aggravated assault, and manslaughter. *See* TEX. PENAL CODE ANN. §§ 19.02, 19.04, 22.02(a), (b). The jury found her not guilty of murder, although she admitted to shooting Parker in the chest, which was the injury that ultimately caused his death. *See id.* 19.02. Aggravated assault requires a showing that Sorenson (1) intentionally and knowingly caused bodily injury to Parker and (2) did so while exhibiting a deadly weapon. *See id.* § 22.02.

Sorenson argues that Parker's use of his fists on her justified her use of deadly force to shoot him. However, multiple law enforcement officers discounted Sorenson's account of the violent assault she described because she did not have injuries consistent with such an assault. There were photographs taken of some bruising, but not to the extent one would expect from such an assault. Sorenson also argues that Ranger Pilkington's "theory" that Parker was shot while in a sit-up position is just a theory. However, evidence presented supported that "theory," such as the photos from the crime scene where Parker's feet were located under the bed, the medical examiner's testimony about the bullet's trajectory through Parker's body and her description of the bullet causing paralysis, and the diagrams Ranger Pilkington created that showed the different trajectory angles depending on where Parker was located. Sorenson gave multiple

20

statements to law enforcement, evidence presented showed that she changed her description of what happened on February 6 and 7, 2017, downplayed the issues between Parker and herself, and embellished her accounts of incidents of Parker's anger, while downplaying her behavior. The jury was free to accept or discount the evidence it heard from the witnesses and from Sorenson's own statements and we defer to its findings. *See Braughton*, 569 S.W.3d at 608; *Brooks*, 323 S.W.3d at 899.

The record does not indicate that the jury was irrational in rejecting the defensive testimony that Sorenson relied on for her claim of self-defense. Therefore, we decline to substitute our own view of the witnesses' credibility for that of the jury. *See Braughton v. State*, 522 S.W.3d 714, 734–35 (Tex. App.—Houston [1st Dist.] 2017), *aff'd*, 569 S.W.3d at 613 ("We cannot substitute our own view of these witnesses' credibility based on a cold record for that of the factfinder."); *Saxton*, 804 S.W.2d at 913. We hold that the evidence is sufficient to support the jury's rejection of Sorenson's self-defense claim, and we overrule her sole issue.

### III.   CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
14th day of October, 2021.

21