

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00483-CR

Louis Joseph **BENEVENTO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2019CR8973
Honorable Frank J. Castro, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:    Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: February 22, 2023

AFFIRMED

Appellant Louis Joseph Benevento appeals his murder conviction. Claiming the jury's verdict rested on pure speculation, Benevento challenges the legal sufficiency of the evidence to support the verdict that included rejecting his self-defense claim. We affirm the trial court's final judgment.

### BACKGROUND

Benevento was arrested and charged with murder in connection with shooting and killing his wife, Alicia Wills, outside the couple's house in Bexar County late one night. Following a

three-day jury trial, the jury found Benevento guilty of murdering Alicia. The trial court sentenced Benevento to fifteen years' imprisonment.

During the guilt-innocence phase of the trial, the State called thirteen witnesses, the majority of which were officers, detectives, and investigators with the Bexar County Sheriff's Office. The State also called its medical examiner expert. Benevento testified in his own defense. He too called his own medical expert.

The undisputed facts include the following:

- A round from a .380 pistol had been fired into the ceiling of Alicia and Benevento's house, and the bullet was recovered in the attic.

- A neighbor's security camera footage shows Alicia walking out of the house in a hurried state. Shortly thereafter, Benevento walks out the front door slowly, appearing to be carrying a pistol and only wearing shorts. He looks around, appears to turn back towards the house, but then turns and walks slowly down the driveway. Within minutes, Benevento walks slowly back into the house still carrying the gun. When Benevento later re-appears at his front door, he is fully dressed.

- Immediately before Alicia's death, she called 911 requesting help. Alicia tells the dispatcher she took a gun and ran outside and was beside her car. Alicia pleads with the dispatcher to send someone because she is in fear of her life claiming her husband has another gun and is going to kill her. She also tells the dispatcher he has a gun and it is pointed at her. Alicia can then be heard screaming for someone to get away and "stop it," while telling the dispatcher again that he is going to kill her. While Alicia's screams become more frantic and more distant from the phone, several shots are heard. Alicia is then silent. At no time is Benevento's voice heard during the 911 call.

- Alicia's car was parked close to the curb of the cul-de-sac opposite from their house. Alicia was found face down on the street, dead, near the front passenger side of her car, which was farthest from the house.

- A .380 pistol was found near or in Alicia's left hand at the scene. Alicia is right-handed. The .380 did not have a magazine in it, and there was no ammunition in the chamber.

- Benevento admitted to shooting Alicia with a .40 pistol. Upon law enforcement's arrival, Benevento told them he had placed the .40 pistol and the magazine to the .380 in the safe in the house's master bedroom, where law enforcement recovered them.

- Both Alicia's and Benevento's right and left hands tested positive for gunshot residue. According to testimony and the gunshot residue report, a positive test result is indicative

that "they may have discharged a firearm, handled a discharged firearm, or were in close proximity to a discharging firearm."

- Alicia suffered four gunshots to her back, one to the back of her right arm, another one to the outside of her left thumb, and another to the right side of her thigh. The State's expert, Dr. Kimberly Molina, the current chief medical examiner at the Bexar County Medical Examiner's Office, concluded there were "no entry wounds on the front of the body," and that the "majority of these wounds travel in the right to left direction, so from the right side to the left side and from a back to front direction. . . . So that would tell us that the firearm was slightly behind and to the right of [Alicia] when she was shot." Defense expert Dr. William Anderson did not disagree with this conclusion.

- Benevento's injury to his head and a bite mark to his hand were consistent with his claim Alicia struck him with an insulated metal cup on his head and bit his hand.

- Benevento's wrecked model airplanes were lying at the edge of his driveway and street.

- Benevento claimed he shot Alicia in self-defense after she pointed the .380, in her left hand, at him.

Testimony from the various deputies, detectives, and investigators focused on the evidence discussed above. They also testified regarding Benevento's demeanor following the shooting of his wife, that he appeared more concerned about his dogs than about his wife. Additionally, the first deputy at the scene stated Benevento asked him whether Alicia was okay, but also said he "hopes she's not alive because he—he hates her with 12 passions . . . that he absolutely hated her."

Benevento's defense utilized the undisputed facts to present his self-defense claim. While caring for his life-long wife who was dying of cancer, Benevento met Alicia who served as his dying wife's chaplain through a healthcare facility. Not long after his former wife died, Benevento and Alicia married. According to Benevento, within six or seven months of getting married, Alicia told him she was having an affair, and Benevento told her he wanted a divorce. This among other things caused strain between them.

On the day of the shooting, Benevento testified when Alicia got home from work at approximately 5:00 p.m., she was "extremely furious," and immediately began hitting him,

punching him, and slapping him in the back of the head. Benevento testified he asked Alicia why she was so upset, but she would not tell him. Benevento claimed their arguing and her abuse continued throughout the remainder of the night. According to Benevento, Alicia at some point grabbed his chest hair, and when he tried to push her away, Alicia bit his left hand. Benevento also testified when he told Alicia he was going to leave and no longer financially assist her, she destroyed his model airplanes.

Thinking their argument was over, Benevento then testified he went to bed in the spare bedroom, but Alicia awoke him and said, "Don't close your eyes. I'm going to shoot you in the back of the head." In response, Benevento stated he "popped up out of bed and went into the living room," sat down in his recliner, but fell asleep. Benevento claimed Alicia woke him up by slapping him, hit him in the head with the insulated metal cup, and told him she was not finished talking with him. Benevento testified Alicia pulled his chest hair again and soon thereafter had the .380 pistol pointed at him. Benevento explained Alicia "blinked [and] I grabbed her hand and that's when the gun went off" shooting into the ceiling, and Alicia let go of the gun and he threw it onto a pile of clothes on the couch. Benevento said he went outside the front door and vomited on the grass, but he could not explain why the neighbor's camera did not film him coming outside the house to vomit or him returning to his house.

According to Benevento, Alicia then grabbed the gun and ran out the front door. Benevento claimed when he went outside he saw Alicia "lying in the street" and told her to get out of the street before the neighbor runs her over. Next, Benevento contended he went back inside the house to get his things to leave. According to Benevento, when he came back outside and looked to make sure he would not hit the metal parts of the airplanes when he left, he saw Alicia "pop[] up from the other side of her [car] with a gun" pointed at him. She was on the phone with 911. Claiming he felt Alicia would shoot him and he had to protect himself,

Benevento shot Alicia. Benevento then stated he saw the magazine from the .380 on the ground, picked it up, and took the magazine and his .40 and placed them inside the safe in the master bedroom.

With respect to Alicia being right-handed but the .380 being near or in her left hand, Benevento claimed Alicia was a proficient right-handed shooter, and he taught her how to shoot ambidextrously. Benevento claimed Alicia was "an excellent shot."

Following his arrest immediately after the shooting, Benevento was interviewed, which recordings were admitted into evidence. Benevento's testimony at trial and his statements during his interview mostly shared consistent statements, however, several key inconsistencies exist. During his interview, Benevento did not discuss his claim that he went to sleep in the spare bedroom and Alicia woke him up threatening to shoot him in the back of the head. Benevento also did not tell any law enforcement personnel that he had vomited the night of the shooting. Moreover, notably, contrary to his trial testimony, wherein Benevento claimed he always kept his .40 in his pants pocket, during his interview, Benevento explained that after Alicia grabbed the .380 and went outside, he retrieved his .40 from his nightstand in the master bedroom, and then followed her outside.

Regarding the parties' experts, both experts agreed concerning the wounds Alicia received and the direction of how they traveled. They also agreed the shot to the right side of her thigh was not a direct shot, but more akin to the bullet ricocheting off something, such as the street. As for the gunshot wound to Alicia's right arm, which exited around her left breast, Dr. Molina agreed with Dr. Williams's conclusion that Alicia's left arm was not likely in its regular position—suggesting it could have been up in the air, placed far ahead or behind the body— because when the bullet exited Alicia's body, had the left arm been in its regular position by the body, the bullet would have either reentered her left arm, or the arm would have at least shown

some sort of injury. The experts' opinions differ as to the placement of Alicia's left arm when she was shot in her right arm and as to the manner Alicia received the gunshot wound to the outside of her left thumb.

Specifically, while neither expert can definitively order the sequence of the gunshots Alicia received, Dr. Anderson opined the evidence supports the scenario that Alicia was holding the .380 in her left hand and pointing it at Benevento when Benevento shot her left hand, and the gun in her hand prevented the bullet from exiting her hand. At some point, Alicia turned to her right with her left hand raised up when Benevento shot her in the right arm and continued shooting, hitting her in the back. However, Dr. Molina disagreed with Dr. Anderson's conclusion that the gun prevented the bullet from exiting Alicia's left hand. Specifically, Dr. Molina opined because of the irregularity of the wound to Alicia's left hand, it was more akin to a reentry wound, resulting from one of the other gunshots.

## APPLICABLE LAW

Under the Penal Code, a person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual, or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2). It is a defense to prosecution for murder that the person's use of deadly force was "justified." TEX. PENAL CODE ANN. §§ 9.02, 9.31–9.32; *see Braughton v. State*, 522 S.W.3d 714, 730 (Tex. App.—Houston [1st Dist.] 2017) (providing that deadly force used in self-defense may be raised as justification for defendant's actions and in support of acquittal against murder charge) *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2018). A person's use of deadly force is justified if, among other things, the person "reasonably believes the deadly force is immediately necessary" to protect himself "against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a)(2)(A).

**STANDARD OF REVIEW**

*A. Legal Sufficiency*

When reviewing the sufficiency of the evidence, we determine whether, "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

This standard coincides with the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The factfinder may and should draw "reasonable inferences" from the evidence but may not draw conclusions based on "mere speculation." *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007).

The factfinder alone judges the evidence's weight and credibility. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). We may not reevaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Braughton*, 569 S.W.3d at 608. We must presume the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Id.*; *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (reviewing court must not sit as thirteenth juror). "Although the parties may disagree about the logical inferences that flow from

undisputed facts, where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (internal quotations omitted).

### B. *Self-Defense*

In a claim of self-defense justifying a defendant's use of deadly force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised defensive issues. *Braughton*, 569 S.W.3d at 608. The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Id.* In contrast, "the State's burden of persuasion is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Id*. at 608–09 (internal quotations omitted). Thus, in reviewing the sufficiency of the evidence to support a conviction for murder when the jury has rejected a defendant's claim of self-defense, we determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational jury would have found the essential elements of murder beyond a reasonable doubt and would have found against the defendant on the self-defense issue beyond a reasonable doubt. *Id.* at 609; *see also Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

The issue of self defense is a fact issue to be determined by the jury, and "'[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory.'" *Braughton*, 569 S.W.3d at 609. (quoting *Saxton*, 804 S.W.2d at 914). Thus, "[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914; *see also Braughton*, 569 S.W.3d at 609.

**ANALYSIS**

In a single issue, Benevento appeals his conviction, claiming the jury based its verdict on mere speculation in rejecting his self-defense claim. Benevento does not deny shooting and killing Alicia. Rather, Benevento claims he shot her in self-defense.

However, the evidence supports the jury's decision to reject his claim. The jury was free to believe the events as reflected on the 911 call—that Benevento is the one who shot the .380 in the house, Alicia attempted to hide behind her car outside, but Benevento heard her on the 911 call, found her, and shot and killed her. Four of the gunshot wounds are to Alicia's back. The three other gunshot wounds include one to the back of her right arm, one to the outside of her left thumb, and the other, a non-direct shot, to the side of her right thigh. The neighbor's security camera footage shows Alicia hurrying outside the front of the house. Shortly thereafter, Benevento walks much slower outside the house, with what the jury could determine to be a gun in his hand, looks around, appears to turn to go inside, but then turns back towards the driveway, and disappears from the footage. A few minutes later, Benevento walks back slowly into his house while still holding a gun.

Moreover, during both his interview and while testifying, Benevento maintained Alicia was screaming and acting irrationally while they argued inside the house and when he heard her calling 911. But, while notably excited and shaky, Alicia's voice on the 911 call can be clearly understood, and she does not plead for her absent mother's help as Benevento claimed she did while speaking to the 911 dispatcher. Additionally, other inconsistencies between Benevento's own testimony as compared to his interview exist. Specifically, Benevento testified as soon as the gun fired inside the house, he ran outside and vomited. However, his neighbor's security camera footage showed him neither exiting nor returning to the house. He also failed to tell law enforcement he had vomited. Benevento further testified he had gone outside his house and

returned another time to tell Alicia to get out of the middle of the street before a car hit her. His exit and reentry to his house was not detected on the camera footage for this claim either. During his interview, Benevento never told detectives Alicia laid in the middle of street. Also, notably missing from Benevento's interview that he testified to, included his claim that Alicia woke him up in the guest bedroom and told him, "Don't close your eyes. I'm going to shoot you in the back of the head."

According to Benevento, Alicia began arguing and abusing him as soon as she walked in the door after work and continued for hours. Benevento claimed she was hitting him, pulling his chest hair, biting him, threatening to kill him, and pulling a gun on him, which resulted in a misfire inside the house. Never did he leave or call anyone for help. Even after she left the house the last time, Benevento went to his bedroom, retrieved his gun from his nightstand, and followed her outside.

Additionally, several members from Bexar County's law enforcement personnel noted Benevento's lack of apparent concern for Alicia's life or for the gravity of the situation. The interview footage depicting his demeanor was admitted into evidence for the jury to view. Benevento acknowledged he did not render Alicia any aid but rather took the clip to the .380 and his .40 and placed them in the safe in the bedroom of the house immediately after he shot her. Benevento did not call 911 for help: he claimed he did not need to because Alicia had already called.

The issue of self-defense does not hinge on whether Benevento and Alicia argued all evening, or whether Alicia irrationally destroyed Benevento's model airplanes and screamed at him or even hit him with a cup or bit him; rather, it depends on whether he was justified, among other things, to "reasonably believe[ his] deadly force [was] immediately necessary" to protect himself "against [Alicia's] use or attempted use of unlawful deadly force" when he followed her

outside and shot her. *See* TEX. PENAL CODE ANN. § 9.32(a)(2)(A). A jury could have reasonably found Benevento not credible because of the inconsistencies between his testimony and his interview and considering the other admissible evidence.

Last, with respect to the parties' medical experts, Dr. Molina and Dr. Anderson agreed on several matters. While Dr. Molina did not agree the evidence supported Dr. Anderson's hypothetical explanation that the gunshot wound to Alicia's left hand suggested she had the gun pointed at Benevento, Dr. Anderson was allowed to fully develop his theory. Dr. Molina provided another explanation. "[W]here there are two permissible views of the evidence, the [jury's] choice between them cannot be clearly erroneous." *Evans*, 202 S.W.3d at 163. The jury is the sole judge of the evidence's weight and credibility, and therefore the jury was entitled to decide which explanation and expert to believe. *See Queeman*, 520 S.W.3d at 622.

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the charged offense beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 609. We further conclude that a rational jury could have found against Benevento on his self-defense issue beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914; *see also Braughton*, 569 S.W.3d at 609.

Benevento's sole issue on appeal is overruled. We affirm the trial court's final judgment.

Irene Rios, Justice